UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WILLIAM J. RATAJACK, JR.,

              Plaintiff,

    -v-

BREWSTER FIRE DEPARTMENT, INC.
OF THE BREWSTER-SOUTHEAST
JOINT FIRE DISTRICT, DONALD GOODWIN,
PHILIP MCMURRAY, ALBERT JACOBS,
BREWSTER-SOUTHEAST JOINT FIRE DISTRICT,
JOHN KLOSOWSKI, MARTIN MILLER, and
STEVEN MILLER

              Defendants.

Case No. 14-CV-7 (KMK)

OPINION & ORDER

---

Appearances:

Elisabeth Seieroe Maurer, Esq.
The Law Office of Elisabeth Seieroe Maurer P.C.
Ridgefield, CT
*Counsel for Plaintiff*

Jeffrey Bruce Siler, Esq.
Siler & Ingber
Garden City, NY
*Counsel for Defendants*

Maria Massucci, Esq.
Catalano Gallardo & Petropoulos, LLP
Jericho, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

      Plaintiff William Ratajack ("Plaintiff"), a former member of the Brewster Fire

Department, Inc. of the Brewster-Southeast Joint Fire District (the "Department"), brings this

action against the Department, Donald Goodwin ("Goodwin"), Philip McMurray ("McMurray"),

Albert Jacobs ("Jacobs"), the Brewster-Southeast Joint Fire District (the "District"), John

Klosowski ("Klosowski"), Martin Miller ("Miller"), and Steven Miller ("Steven") (collectively,

"Defendants"), asserting claims of defamation and violation of his rights to due process and free

speech.  Defendants have moved for summary judgment on each cause of action, and Plaintiff

has moved for summary judgment on his procedural due process claim.  For the reasons to

follow, Plaintiff is entitled to summary judgment on his procedural due process claim, and

Defendants' Motion is granted with respect to Plaintiff's First Amendment retaliation,

defamation, and substantive due process claims.

I.  Background

A.  Facts

The following facts are taken from Defendants' Local Rule 56.1 statement in support of

summary judgment, Plaintiff's response, Plaintiff's statement of additional facts creating a

material dispute; Plaintiff's Local Rule 56.1 statement in support of his motion for partial

summary judgment, Defendants' response, Defendants' counter statement of facts, and other

documents in the record.  The facts as described below are not in dispute, except to the extent

indicated.

1.  The Department, The District, and Plaintiff's History There

Plaintiff is self-employed as the owner of Southeast Mechanical Corp., a company in the

business of installing commercial heating and plumbing systems.  (Defs.' Rule 56.1 Statement of

Material Facts ("Defs.' 56.1") ¶¶ 1–2 (Dkt. No. 40); Pl.'s Resp. to Defs.' Local Rule 56.1

Statement ("Pl.'s 56.1") ¶¶ 1–2 (Dkt. No. 48).)  In 1999, Plaintiff became a member of the

Department, and, after a probationary period, was made Lieutenant and was then promoted by

the Fire Chief to Captain.  (*See* Defs.' 56.1 ¶¶ 3–4; Pl.'s 56.1 ¶¶ 3–4; Att'y Decl. ("Massucci

2

Decl.") Ex. C ("Pl.'s Dep. Tr.") 16–18 (Dkt. No. 38).)  Additionally, Plaintiff was elected by the

members of the Department to Second Assistant Chief and, in 2012, to First Assistant Chief.

(*See* Defs.' 56.1 ¶ 4; Pl.'s 56.1 ¶ 4; Pl.'s Dep. Tr. 16–18.)  Plaintiff had earlier served as captain.

(*See* Defs.' 56.1 ¶ 13; Pl.'s 56.1 ¶ 13.)  He resigned that position, however, over concerns

relating to how the Fire Department was being managed, including that certain members were

not attending calls, such as members Michael Miller ("Michael"), Steven, and Paul

DeBartolomeo ("DeBartolomeo").  (Defs.' 56.1 ¶¶ 12–13; Pl.'s 56.1 ¶¶ 12–13.)  Michael and

Steven are brothers, and their father, Miller, is also a member of the Department. (*See* Defs.'

56.1 ¶ 8; Pl.'s 56.1 ¶ 8; Massucci Decl. Ex. H ("Miller Dep. Tr.") 13–14.)  All three are

Caucasian, but Miller also has two mixed-race, African-American children.  (Defs.' 56.1 ¶¶ 9–

10; Pl.'s 56.1 ¶¶ 9–10; Miller Dep. Tr. 14.)  Arguably consistent with Plaintiff's concerns over

Steven's, Michael's, and others' responsiveness, the Department or the District in 2013 hired

paid EMS workers to cover daytime calls during the week due to concerns over an insufficient

number of Fire Department members choosing to respond to calls.  (Defs.' 56.1 ¶ 17; Pl.'s 56.1

¶ 17.)[1]

  This case involves two distinct but related entities: the District and the Department.  The

District was and is a political subdivision of the State of New York.  (Pl.'s FRCP 56.1 Statement

of Material Facts Not in Dispute ("Pl.'s Cross 56.1") ¶ 14 (Dkt. No. 53); Resp. to Pl.'s FRCP

56.1 Statement of Material Facts Not in Dispute and Counter Statement of Facts ("Defs.' Cross

---

[1] Plaintiff testified that he had concerns with Michael's, Steven's, and DeBartolomeo's participation in calls, (*see* Pl.'s Dep. Tr. 21–22), but, according to his testimony, Plaintiff did not speak with Michael about these concerns, (*see id.* at 27).  Additionally, and arguably relevant to the relationship between Plaintiff and the Millers, both Plaintiff and Miller testified that Plaintiff's wife had sex with Michael, (*see id.* at 27; Miller Dep. Tr. 52–53), although Plaintiff objects to the admissibility of this testimony on the grounds that Plaintiff and Miller did not have personal knowledge of this fact, (*see* Pl.'s 56.1 ¶ 5).

56.1") ¶ 14 (Dkt. No. 56).)  Formed under New York state law and required to operate in

compliance with such law, the District has the authority to tax, organize, and operate fire

companies within the District.  (Pl.'s Cross 56.1 ¶¶ 15–16; Defs.' Cross. 56.1 ¶¶ 15–16.)  The

Department is one such fire company.  The Commissioner of the District serves a term of five

years, and Klosowski is currently in his fourth term and sixteenth year as Commissioner.  (*See*

Defs.' 56.1 ¶ 81; Pl.'s 56.1 ¶ 81; Massucci Decl. Ex. J ("Klosowski Aff.") ¶ 2.)  In contrast, the

Fire Department has a chief, first assistant chief, and a second assistant chief, who are elected by

the membership and can serve two terms of one year each.  (Defs.' 56.1 ¶¶ 73–74; Pl.'s 56.1

¶¶ 73–74.)  The chief of the Department appoints lieutenants, with advice from the assistant

chiefs.  (Defs.' 56.1 ¶ 95; Pl.'s 56.1 ¶ 95.)  In 2013, Bill Rieg ("Rieg") was elected chief, and

was a member of the Department Board of Directors (the "Board of Directors") at the same time.

(Defs.' 56.1 ¶ 75; Pl.'s 56.1 ¶ 75; Pl.'s Cross 56.1 ¶ 5; Defs.' Cross 56.1 ¶ 5.)  Additionally,

sometime around mid-July to mid-August 2013, Goodwin, the Vice President of the Board of

Directors, served as the acting president of the Board of Directors.  (Defs.' 56.1 ¶¶ 90–91; Pl.'s

56.1 ¶¶ 90–91; Pl.'s Cross 56.1 ¶¶ 6–7; Defs.' Cross 56.1 ¶¶ 6–7.)  Jacobs—who would vote to

expel Plaintiff from the Department—was another member, as was McMurray, who has been

with the Department for 25 years.  (Defs.' 56.1 ¶ 94; Pl.'s 56.1 ¶ 94; Pl.'s Cross 56.1 ¶¶ 8–9;

Defs.' Cross 56.1 ¶¶ 8–9.)

　　　The Department is governed in part by a set of bylaws approved by the Board of Fire

Commissioners (the "Board of Commissioners").  (*See* Massucci Decl. Ex. L ("Bylaws"); *see*

*also* Pl.'s Cross 56.1 ¶ 17; Defs.' Cross 56.1 ¶ 17.)  The bylaws provide how membership in the

Department may end, including for cause, and require that any member be notified of the charges

brought against him or her.  (*See* Pl.'s Cross 56.1 ¶¶ 18–21, 58–59; Defs.' Cross 56.1 ¶¶ 18–21,

58–59.)   Article 12 of those Bylaws, in part, reads:

**Section 1**

The Board of Directors may remove a member from the rolls of the department, upon due notice via a registered letter from the recording secretary, for the following reasons:

      ***

    d)   For conduct unbecoming an officer, firefighter, or detrimental to the best interests of the department

      ***

**Section 2**

Any member may be expelled from the department or penalized for misconduct as determined by the Board of Directors.  Upon written request, such member will be entitled to a hearing, whereupon arguments and evidence may be presented in his/her defense.  Upon receipt of his/her written request[,] he/she is entitled to be furnished with a written copy of the charges against him.  He/she shall receive those written charges at least one week prior to the regular or special meeting before which his case is to be heard.  All expulsions and removals, except as provided for by state law, shall be by a majority vote made by ballot by the Board of Directors.

(Bylaws Art. 12.)

      2.   The July Incident

On July 11, 2013, when he was First Assistant Chief, Plaintiff marched in the Mahopac parade dressed in uniform.  (*See* Defs.' 56.1 ¶¶ 19–20; Pl.'s 56.1 ¶¶ 19–20; Defs.' Counter Statement of Facts ("Defs.' Counter Cross") 56.1 ¶¶ 2–3 (Dkt. No. 56); Massucci Decl. Ex. M ("Aug. 15 Letter").)[2]  Plaintiff had George Hill ("Hill"), another member of the Fire Department, drive him to the parade, and Plaintiff drank beer before, during, and after the parade at the

---

    [2] In a few places, there are allusions to the incident as having occurred on July 17, (*see* Defs.' 56.1 ¶ 18; Pl.'s Dep. Tr. 90 ("Q.  On July 17th of 2013, was the fire department participating in a parade?  A.  Yes.")); however, it appears that July 11, 2013 is the correct date, (*see* Aug. 15 Letter 1).

firehouse.  (Defs.' 56.1 ¶¶ 21–22; Pl.'s 56.1 ¶¶ 21–22; Pl.'s Dep. Tr. 97.)  That evening, after

returning from the parade, while at the firehouse, Plaintiff claims to have seen some members

who did not participate in the parade in a vehicle in the parking lot.  (Defs.' 56.1 ¶ 23; Pl.'s 56.1

¶ 23; *see also* Defs.' Counter Cross 56.1 ¶ 5.)  Plaintiff recognized Steven in the passenger seat

of the vehicle, which Plaintiff believed belonged to DeBartolomeo.  (Defs.' 56.1 ¶¶ 24–25; Pl.'s

56.1 ¶¶ 24–25; *see also* Defs.' Counter Cross 56.1 ¶¶ 5–6.)  After seeing these non-participating

members, Plaintiff testified that he spoke with Hill, Robert Burns, and Dave O'Hara ("O'Hara").

(Defs.' 56.1 ¶ 26; Pl.'s 56.1 ¶ 26.)  In so doing, according to Plaintiff, he referred to the non-

participating members, including some of the people in the car, as "a piece of shit" and "a bunch

of niggers," and further used some "generic curse words," (Pl.'s 56.1 ¶¶ 27–28), although

Defendants claim that Plaintiff used these words to refer to Steven, (Defs.' 56.1 ¶¶ 27–28), or the

Millers more generally, (*see* Defs.' Counter Cross 56.1 ¶ 8.)

 According to Defendants, Plaintiff then proceeded downstairs with McMurray, and

continued the angry exchange with McMurray on the front steps of the firehouse, (Defs.' 56.1

¶ 29 (citing Pl.'s Dep. Tr. 107–08; Massucci Decl. Ex. I ("Aug. 14 Meeting Tr.") 88–91)), which

Plaintiff disputes, (*see* Pl.'s 56.1 ¶ 29 (citing Pl.'s Dep. Tr. 107–08; 114)).[3]  While on the front

---

[3] Here and elsewhere, Plaintiff takes issue with Defendants' reliance on Exhibit I,
objecting here that "Defendants' Exhibit I is purported to be a transcript of a meeting held on
August 14, 2013 by the Board of Directors of the Brewster Fire Department and the
Commissioners of the Brewster-Southeast Joint Fire District," and that "the 'transcript' has not
been verified by any witness or the court reporter as to its completeness or accuracy, and
numerous pages are missing." (Pl.'s 56.1 ¶ 29.) However, the Exhibit plainly includes a
certificate from the court reporter, indicating that "the proceedings set forth within the transcript
[are] a true record of the proceedings." (Aug. 14 Meeting Tr. 121.) Accordingly, as a certified
copy of a public record, it is self-authenticating and admissible pursuant to Fed. R. Evid. 902(4).
*See* Fed. R. Evid. 902(4); *see also Ball v. A.O. Smith Corp.*, 451 F.3d 66, 71 (2d Cir. 2006) ("The
original transcript, which includes a certification by the court reporter, is self-authenticating."
(citing Fed. R. Evid. 902(4))); *Moran v. Livingston*, —F. Supp. 3d—, 2016 WL 93402, at *4
(W.D.N.Y. Jan. 7, 2016) ("Affixed to the transcript of [the] [p]laintiff's deposition testimony is a

steps of the firehouse, Plaintiff testified that he spoke in a "passionate" manner with a "raised" voice and was "angry" and "animated." (Defs.' 56.1 ¶ 30; Pl.'s 56.1 ¶ 30.) The Parties dispute, however, whether Plaintiff continued to use the word "nigger" while outside the firehouse. (*Compare* Defs.' 56.1 ¶ 32 ("Mr. Ratajack continued to curse and use racial slurs including the word 'nigger' while speaking in a raised, passionate, animated[,] and angry voice while on the front steps of the firehouse." (citing Massucci Decl. Ex. K ("McMurray Aff."); Aug. 14 Meeting Tr. 11–16, 23–26, 55–57, 90–96)) *with* Pl.'s 56.1 ¶ 32 ("Deny that 'Ratajack continued to curse and use racial slurs including the word 'nigger' while speaking on the front steps of the firehouse.'" (emphasis omitted) (citing Pl.'s Dep. Tr. 117–21, 124)).)

Indeed, Defendants indicate that McMurray tapped Ratajack on the shoulder after he screamed "nigger," and reminded Plaintiff that he was in uniform and could not scream racial slurs in public, to which Plaintiff responded that he could say whatever he wanted, before again yelling "niggers" and referring to Mexicans in a derogatory manner, (Defs.' 56.1 ¶¶ 45–47 (citing, inter alia, Aug. 14 Meeting Tr. 93–94, 96–99; McMurray Aff.); *see also* McMurray Aff. ¶¶ 14–16; Aug. 14 Meeting Tr. 93–94), an assertion Plaintiff denies, (*see* Pl.'s 56.1 ¶¶ 45–47 (citing Pl.'s Dep. Tr. 119–21, 124)). According to Defendants, Plaintiff continued to yell "niggers" while pointing at the vehicle in which Steven was a passenger, (Defs.' 56.1 ¶ 48 (citing Aug. 14 Meeting Tr. 95; McMurray Aff.)), which Plaintiff disputes, (*see* Pl.'s 56.1 ¶ 48 (citing Pl.'s Dep. Tr. 120–21, 124; Miller Dep. Tr. 11)). The Parties agree, however, that at no time did Plaintiff see Steven exit the vehicle in the parking lot, nor did Plaintiff see Steven or any other

---

notarized statement by the Court Reporter . . . certifying that the transcript 'constitutes a true and accurate and complete transcript of the testimony' . . . . Because this notarized statement authenticates the document in accordance with Federal Rule of Evidence 902, the [c]ourt will consider [the] [p]laintiff[']s deposition testimony.").

member who did not march enter the firehouse to socialize.  (Defs.' 56.1 ¶ 50; Pl.'s 56.1 ¶ 50.)

Indeed, Plaintiff does not know why the vehicle was in the parking lot, and never inquired as to

why Steven was there.  (Defs.' 56.1 ¶ 51; Pl's 56.1 ¶ 51.)  Nevertheless, according to

Defendants, Plaintiff was loud enough that people at the gas station across the street stopped and

looked when Plaintiff screamed "nigger."  (Defs.' 56.1 ¶ 31 (citing Aug. 14 Meeting Tr. 95).)

       In disputing whether Plaintiff simply does not remember using or in fact did not use the

word "nigger" while outside, both sides cite Plaintiff's deposition transcript.  (*See* Defs.' 56.1

¶ 33 (citing Pl.'s Dep. Tr. 118–19); Pl.'s 56.1 ¶ 33 (citing Pl.'s Dep. Tr. 118, 120, 121, 124).)

However, Plaintiff's deposition transcript is less than perfectly clear.  In pertinent part, it reads:

> Q.  Do you recall more specifically what you said to Chief McMurray?
>
> A.  Just that it was a bunch of bullshit that he was allowing non-marchers to come down, and he shouldn't be allowing this to go on.
>
> Q.  Did you use the word "nigger" again?
>
> A.  Not that I recall.
>
>            ***
>
> Q.  Did you use that word [nigger] at all when you were speaking with Chief McMurray?
>
> A.  Not that I recall.
>
>            ***
>
> Q.  Do you remember telling Chief McMurray because of niggers like this, this firehouse has gone to shit?
>
> A.  That's news to me.
>
> Q.  That would be a no?
>
>     [Ms. Maurer]: Answer the question.
>
> A. No, I didn't say that.

\*\*\*

Q.  Do you have any recollection of speaking any other racial or derogatory terms while on the steps speaking with Chief McMurray?

A.  I believe I cursed.

Q.  Did you use any type of racial terms while on the steps with Chief McMurray?

A.  Not that I remember.

\*\*\*

Q.  If I were to tell you that people at the gas station [across the street from the firehouse] heard you scream nigger, would that surprise you?

A.  Yes.

(Pl.'s Dep. Tr. 117–21, 124.)

According to Defendants, while speaking with McMurray, Plaintiff also exclaimed "fuck you, fuck them, fuck everybody."  (Defs.' 56.1 ¶ 34 (citing, inter alia, Aug. 14 Meeting Tr. 90); *see also* McMurray Aff. ¶ 18.)[4]  Additionally, according to Defendants, Plaintiff threatened McMurray, stating that he "better get on the same page or there [would be] a fucking problem" and that that is "what [he] wants."  (Defs.' 56.1 ¶ 35 (second alteration in original) (citing, inter alia, Pl.'s Dep. Tr. 120; McMurray Aff.; Aug. 14 Meeting Tr. 90–91, 94–95).)  Indeed, Plaintiff's deposition transcript supports the notion that he told McMurray that they had better get on the same page or there would be a "fucking problem."  (Pl.'s Dep. Tr. 120 ("Q.  Did you indicate to Chief McMurray during that conversation that he had better get on the same page or

---

[4] Plaintiff disputes this, but cites only pages 119 through 121 of his own deposition transcript, which do not reflect that he was asked about such a statement.  (*See* Pl.'s 56.1 ¶ 34; Pl.'s Dep. Tr. 119–21.)

Additionally, Defendants cite Exhibit R, which appears to be surveillance footage from around the firehouse from the night in question.  However, the video has no sound.

there will be a fucking problem?  A.  Yes.")  According to Plaintiff, by that, he meant that

McMurray "kept usurping [Plaintiff's] power and that he was allowing non-marchers and the

likes [sic] to just come and not be part of the solution, be part of the problem."  (*Id.*  120–21.)[5]

Additionally, Defendants claim that Plaintiff told McMurray that he better get on the same page

or they would be "fighting," and that Plaintiff would take McMurray out of office, (*see* Defs.'

56.1 ¶ 36 (citing McMurray Aff. ¶ 17; Aug. 14 Meeting Tr. 94–95)); however, Plaintiff denies

that (*see* Pl.'s Dep. Tr. 121 ("Q.  Did you indicate to [McMurray] that he'd better be on board

with you or we're going to be fucking fighting?  A.  No.  I don't recall that.").)[6]  Additionally,

according to McMurray, Plaintiff "stated . . . that he wanted to get rid of certain members when

he became chief," (Defs.' 56.1 ¶ 37 (citing McMurray Aff.; Aug. 14 Meeting Tr. 94–95)),

although Plaintiff disputes this, (Pl.'s 56.1 ¶ 37 (citing Pl.'s Dep. Tr. 121)).

    Sean Crowley ("Crowley"), a member of the Fire Department, testified under oath that he

observed and heard Plaintiff threatening McMurray, and screaming at him that Plaintiff was

going to have the Millers removed from the department, (Defs.' 56.1 ¶ 38 (citing Aug. 14

---

[5] In his 56.1 statement, Plaintiff further says that he was "reminding . . . McMurray of the chain of command saying that 'we needed to get on the same page or it's going to be a rough two years when I become Chief.'"  (Pl.'s 56.1 ¶ 35.)  However, the only material that Plaintiff cites in support of this proposition is ¶ 49 of Exhibit A, a copy of the Complaint in this case, and pages 120–121 of Exhibit C.  However, with respect to the former, Plaintiff's Complaint is not verified, and, therefore, is not admissible evidence.  *See, e.g.*, *Alleva v. N.Y.C. Dep't of Investigation*, 696 F. Supp. 2d 273, 278 (E.D.N.Y. 2010) ("The [c]omplaint is not verified, however; it bears only the signature of [the plaintiff's] attorney, not the signature of [the plaintiff] himself, and [the plaintiff's] attorney does not attest to any 'personal knowledge' of the [c]omplaint's allegations.  'Personal knowledge' is required under Rule 56(e)(1) . . . ."), *aff'd*, 413 F. App'x 561 (2d. Cir. 2011).  Likewise, with respect to the latter, that cited portion of Plaintiff's deposition transcript does not contain that quote.  (*See* Pl.'s Dep. Tr. 120–21.)

[6] Plaintiff also disputes that he threatened "to get McMurray out of office," and that chiefs are elected by the membership and can only be removed by the District, citing ¶ 25 of his affidavit.  (*See* Pl.'s 56.1 ¶ 36.)  However, ¶ 25 of his affidavit discussed an investigation into Plaintiff's conduct.  (*See* Maurer Decl. Ex. 4 ("Pl.'s Aff.") ¶ 25.)

Meeting Tr. 11–16)); however, Plaintiff disputes the truth of those statements, (*see* Pl.'s 56.1 ¶ 38 (citing Pl.'s Dep. Tr. 121)).  Likewise, Thomas Giambattisto ("Giambattisto") testified under oath that same evening that he observed and heard Plaintiff yell "nigger" at fellow members, and saw McMurray attempting to calm Plaintiff down, (Defs.' 56.1 ¶ 39 (citing Aug. 14 Meeting Tr. 23–26)), which Plaintiff again disputes, (*see* Pl.'s 56.1 ¶ 39 (citing Pl.'s Dep. Tr. 120–21, 124)).  In addition, according to Defendants, Michael Bizarro, an engineer lieutenant for the Fire Department, testified that he observed and heard Plaintiff scream at fellow members, "it's because of niggers like that why this fire department is going to shit;" yell "nigger" or "fucking niggers" additional times; and make a derogatory comment about Mexicans.  (Defs.' 56.1 ¶¶ 40–41 (citing Aug. 14 Meeting Tr. 55–57).)  Plaintiff disputes that he said this, however.  (Pl.'s 56.1 ¶¶ 40–41 (citing Pl.'s Dep. Tr. 119, 120–21, 124).)  In total, according to testimony from McMurray, at some point in the evening, Dean Silverblade ("Silverblade"), Robert Burns, Timothy Thomas, Katie Lanning, Giambattisto, Kenneth Clair ("Clair"), Hill, Michael Bizarro, and Jen Xavier were all in the parking lot that evening.  (*See* Massucci Decl. Ex. G ("McMurray Dep. Tr.") 112–14; *see also* Pl.'s Cross 56.1 ¶ 43; Defs.' Cross 56.1 ¶ 43.)

### 3.  Investigation and Vote To Expel Plaintiff

Miller became aware of the July 11 incident the following day, when several members contacted him to advise him as to what had transpired.  (Defs.' 56.1 ¶ 100, Pl.'s 56.1 ¶ 100.)  Specifically, Crowley and others informed Miller that Plaintiff, appearing angry, used racial slurs, referred to Miller and his family as worthless "niggers," and made further threats against the Miller family.  (*See* Defs.' 56.1 ¶¶ 101, 103; Pl.'s 56.1 ¶¶ 101, 103.)  Miller, perceiving a threat to his family and himself, contacted Rieg within a few days after the incident, and informed him that Miller felt threatened and considered Plaintiff's behavior inappropriate for an

officer.  (Defs.' 56.1 ¶¶ 102, 104; Pl.'s 56.1 ¶¶ 102, 104.)  Rieg assured Miller that he would investigate the matter.  (Defs.' 56.1 ¶ 105, Pl.'s 56.1 ¶ 105.)  Additionally, Miller sent a letter to the Board of Commissioners and the Board of Directors relating to what he had been told about Plaintiff's behavior.  (*See* Defs.' 56.1 ¶ 106; Pl.'s 56.1 ¶ 106.)

Sometime after the incident, Rieg asked to speak with Plaintiff.  (Defs.' 56.1 ¶ 52; Pl's 56.1 ¶ 52.)  When Rieg asked Plaintiff if he had called the Millers a bunch of niggers, Plaintiff responded yes, and Rieg suspended him for 30 days.  (Defs.' 56.1 ¶¶ 53–54; Pl's 56.1 ¶¶ 53–54; Pl.'s Cross 56.1 ¶¶ 22, 25; Defs.' Cross 56.1 ¶¶ 22, 25; Defs.' Counter Cross 56.1 ¶ 9.)  In his deposition, Plaintiff recounted his conversation in the following manner:

Q. Did you go to speak with [Rieg] or did he request to speak with you?

A. He approached me.

Q. Was there anyone else around when you had the conversation with him?

A. Yes. I'm sorry. No.

Q. Was there someone else there when he asked to speak with you?

A. Yes.

Q. Who was there?

A. I don't remember.

Q. Was it more than one person?

A. One or two.

Q. Where did you actually have the conversation with him?

A. In the chief's office.

Q. Was it just you and him?

A. Yes.

Q.  Can you tell me the sum and substance of that conversation?

A.  He asked me if I called the Millers a bunch of niggers.

Q.  What did you respond?

A.  Yes.

Q.  Was any more detail regarding the circumstances of you calling the Millers niggers discussed?

A.  No.

Q.  Did Chief Rieg ask you anything else?

A.  No.

Q.  Was there any more to the conversation other than what you just told me?

A.  No.

Q.  Were you suspended?

A.  Yes.

Q.  Was that by Chief Rieg?

A.  Yes.

Q.  Was it during that meeting or conversation?

A.  It was at the end of that question.

Q.  When you say "question," you're referring to when he asked you if you called the Millers a bunch of niggers?

A.  Yes.

Q.  For how long did he suspend you?

A.  30 days.

Q.  Did you apologize for what you did?

A.  No.

Q.  Other than simply responding yes, did you say anything else to Chief Rieg?

A.  No.

Q.  After he advised you you were suspended for 30 days, did you say anything to him?

A.  Yes.

Q.  What did you say?

A.  I asked him for a ride to my shop.

Q.  Did he give you a ride?

A.  Yes.

Q.  Did you have any further conversation?

A.  Yes.

Q.  Can you tell me the sum and substance of that conversation?

A.  We discussed what was going on and—I don't think I apologized to him, but I told him that I had always worked hard for him, and I would see him after my suspension.

Q.  What, if anything, did he say?

A.  Not much.

Q.  Was this a conversation that continued while he was driving you to the shop?

A.  Yes.

Q.  Did you ever speak with him again after that conversation about this incident?

A.  No.

Q.  Have you spoken to him at all since that conversation?

A.  No.

(Pl.'s Dep. Tr. 127–30.)  Sometime after that conversation, according to Plaintiff, he spoke with

mechanic named Joe Dexter ("Dexter") who advised Plaintiff to get a lawyer because "there

14

were discussions at the firehouse about trying to throw [Plaintiff] out." (*Id.* at 130–31.)  Apart from this conversation with Dexter, according to Plaintiff, he was never informed that he may be removed from the Department before receiving notification of his expulsion.  (*Id.* at 137.)[7]

On July 30, 2013, the Board of Commissioners held a meeting, notice of which was not sent to Plaintiff, at which Miller's letter relating to Plaintiff and the underlying incident were to be discussed.  (*See* Massucci Decl. Ex. F ("Goodwin Dep. Tr.") 44; *see also* Pl.'s Cross 56.1 ¶¶ 26–27; Defs.' Cross 56.1 ¶¶ 26–27.)  In that letter, dated July 22, 2013 to Giambattisto, the Fire District's Secretary, Miller described the incident of July 11.  (*See* Massucci Decl. Ex. N ("Miller Letter").)  According to Plaintiff, the letter included a number of incorrect assertions, including that Plaintiff had previously been suspended for "conduct unbecoming," had to be restrained by certain members of the Department, had tried to discredit the Miller family, made threats toward the Millers, and was a racist who posed a safety threat to others, (*see* Pl.'s 56.1 ¶¶ 66(b)–(gg); Pl.'s Counter 56.1, at unnumbered 52–57 ¶¶ 1–35), when, according to Plaintiff, these assertions were incorrect, (*see* Pl.'s 56.1 ¶¶ 66(b)–(gg) (citing, inter alia, Massucci Decl. Ex. D ("Jacobs Dep. Tr.") 162, 166, 170; Massucci Decl. Ex. E ("Klosowski Dep. Tr.") 19; Goodwin Dep. Tr. 41–42, 76–78, 82–84; McMurray Dep. Tr. 92–96, 99, 102, 105–06, 108–09; Att'y's Decl. ("Maurer Decl.") Ex. 2 ("Hill Dep. Tr.") 46–47 (Dkt. No. 48); Miller Letter); Pl.'s Counter 56.1, at unnumbered 52–57 ¶¶ 1–35 (citing, inter alia, Jacobs Dep. Tr. 162, 166, 170; Klosowski Dep. Tr. 19; Goodwin Dep. Tr. 41–42, 76–78, 82–86; McMurray Dep. Tr. 82–85, 92–

---

[7] Plaintiff does, however, indicate in his deposition that, during his suspension, McMurray told him that Miller's letter requested Plaintiff be expelled for racial discrimination and harassment of his family.  (Pl.'s Aff. ¶ 19.)

96, 99, 102, 105–06, 108; Miller Letter; Hill Dep. Tr. 46–47).)[8]  When asked at his deposition,

Plaintiff indicated that he was not aware of this letter being sent to anyone beyond its original

distribution to the District.  (Pl.'s Dep. Tr. 188–89.)

      On August 14, 2013, the Board of Commissioners had its regular meeting, which

Klosowski attended, and advance notice of which was not sent to Plaintiff.  (Defs.' 56.1 ¶ 83;

Pl.'s 56.1 ¶ 83; Pl.'s Cross 56.1 ¶¶ 11, 29; Defs.' Cross 56.1 ¶¶ 11, 29.)[9]  The Board of Directors

was invited to the meeting to discuss the issue involving Plaintiff.  (Klosowski Dep. Tr. 60.)

However, the Board of Commissioners did not have quorum because Clair was a witness to the

incident, and therefore had to excuse himself.  (*Id.* at 61.)  The Board of Commissioners,

consequently, adjourned its meeting, and the Commissioners were invited to the Board of

Directors meeting on the same date to hear testimony of witnesses to the incident involving

Plaintiff, after which time the Board of Commissioners reconvened its regular meeting.  (Defs.'

56.1 ¶¶ 85–86; Pl.'s 56.1 ¶¶ 85–86.)  Plaintiff did not testify at that meeting, nor did Silverblade,

Burns, Steven, Miller, DeBartolomeo, Timothy Thomas, O'Hara, James Friedlander, or John

Nelson.  (*See* Pl.'s Cross 56.1 ¶¶ 44–53; Defs.' Cross 56.1 ¶¶ 44–53.)  The Board of Directors

voted to expel Plaintiff, (Defs.' 56.1 ¶ 79; Pl.'s 56.1 ¶ 79; Defs.' Counter Cross 56.1 ¶ 18), in

part based on Miller's letter, (Pl.'s Cross 56.1 ¶ 56; Defs.' Cross 56.1 ¶ 56), although the Parties

---

     [8] In the relevant portion of his 56.1 Statement, Plaintiff also includes a number of
statements of purported fact concerning whether others felt unsafe with Plaintiff in command of
a fire response.  (*See* Pl.'s 56.1 ¶ 66(ii)–(nn); Pl.'s Counter 56.1, at unnumbered 54–57 ¶¶ 37–
42.)  These statements appear not to contradict Miller's letter specifically, but rather Steven's
February 27, 2012 letter which Plaintiff characterizes as indicating that Steven resigned because
Plaintiff "operated un-safely" and was a "liability" to the Department.  (*See* Pl.'s 56.1 ¶ 66(hh);
Pl.'s Counter 56.1, at unnumbered 57 ¶ 36.)

     [9] The Board of Commissioners also periodically held special meetings, notice of which
would be posted online six to seven days before the meeting is to occur.  (Defs.' 56.1 ¶ 82; Pl.'s
56.1 ¶ 82.)

dispute whether Goodwin voted to expel Ratajack, (*compare* Defs.' 56.1 ¶ 91 ("Goodwin was present at the July 30, 2013 meeting of the Board of Directors but did not vote to expel [Plaintiff] at the August 13th meeting) *with* Pl.'s 56.1 ¶ 91 ("Deny that Goodwin did not vote.")).

There is no question that Plaintiff did not call any witnesses at the July 30 or August 14 meetings, (Pl.'s Cross 56.1 ¶ 31, 55; Defs.' Cross 56.1 ¶ 31, 55); however, the Parties dispute whether Plaintiff was allowed to have his attorney present and more generally to tell his side of the story. (*Compare* Pl.'s Cross 56.1 ¶¶ 30, 32, 54 *with* Defs.' Cross 56.1 ¶¶ 30, 32, 54.)[10] In support of their positions, both Parties cite Jacobs' testimony, which reads in pertinent part:

Q. And so in that comment where you said there's two sides to every story—

A. Mm-hmm.

Q. —you never heard anything from [Plaintiff] regarding this incident, did you?

A. Did I hear?

Q. You never heard any testimony from [Plaintiff]?

A. No, I didn't.

Q. And [Plaintiff] was never allowed to call a witness, even one; is that correct?

    Ms. Nanis: Objection

A. He was allowed.

Q. At the hearing—at the meeting on August 14th?

A. That's not how you supposed [sic] the question, Counsel.

Q. So on August 14th, was there an attorney present for [Plaintiff]?

---

[10] Plaintiff also asserts that, "[d]uring the 'hearing,' counsel for the Brewster Fire Department and Brewster Fire District 'read in' unsworn statements that had been emailed to them from witnesses to the evening of July 13, 2013 incident with Ratajack." (Pl.'s Cross 56.1 ¶ 33.) Defendants object, however, rightly noting that Plaintiff fails to support this statement with any reference to the evidence. (Defs.' Cross 56.1 ¶ 33.)

A.  No, there wasn't.

Q.  Was there any witness that was called at [Plaintiff's] request?

     Ms. Nanis: On August 14th?  On August 14th?

     Ms. Maurer: There hasn't been any other hearings.  So, yes, on August 14th.

A.  Not to my knowledge.

Q.  So you just said—

A.  Mm-hmm.

Q.  —there's two sides to every story.

A.  Yes, there is.

Q.  And you never heard [Plaintiff's], did you?

A.  No, I didn't.  But we offered him a hearing.

(Jacobs Dep. Tr. 171–72.)[11]  However, Hill expressed surprise that Plaintiff did not have more of

an opportunity to share his side of the story, testifying to the following in his deposition:

Q.  Were you surprised when they expelled [Plaintiff]?

     Ms. Nanis: Objection. You can answer.

A.  Totally.

Q.  Can you tell me why?

A.  Why?

Q.  Yeah.

A.  I just didn't understand how you could possibly do that without even letting the man have anything to say as to what happened. I thought this was America.

---

[11] In support of his claim that he was not allowed to have an attorney present to represent his interests at either the July 30, 2013 or August 13, 2013 meetings, Plaintiff also cites the Goodwin's deposition transcript.  (*See* Pl.'s Cross 56.1 ¶ 32 (citing, inter alia, Goodwin Dep. Tr. 87).)

Q.  So you thought that he should have an opportunity to dispute the claims in [Miller's] letter?

A.  Definitely.

      Ms. Nanis: Objection.

(Hill Dep. Tr. 60.)[12]

By letter dated August 15, 2013, Plaintiff received notice that he was removed from the Fire Department for violations of the bylaws.  (Defs.' 56.1 ¶ 56; Pl's 56.1 ¶ 56; Defs.' Counter Cross 56.1 ¶ 11; *see also* Aug. 15 Letter.)  Plaintiff did not participate in a hearing before the removal.  (*See* Pl.'s Cross 56.1 ¶ 39; Defs.' Cross 56.1 ¶ 39.)  Just over one week later, by letter dated August 23, 2013, counsel for Plaintiff submitted a letter, which read in part:

> Please accept this letter as Chief Ratajack's appeal of the decision of the Board of Fire Commissioners and the Board of Directors pursuant to Article 12 Sec. 2 of the By-Laws of Brewster Fire Department, Inc. of the Brewster-Southeast Joint Fire District.  Considering that the Board of Directors has rendered a decision without the minimal due process of prior notice and a right to be heard, I would suggest that the Boards consider voluntarily nullifying their decision and revisiting this with a neutral fact finder and after providing me with the following documents . . . .

(Massucci Decl. Ex. O ("Pl.'s Att'y's Letter") 1; *see also* Defs.' 56.1 ¶ 57; Pl's 56.1 ¶ 57; Defs.' Counter Cross 56.1 ¶ 12.)  Several months later, on November 26, 2013, Plaintiff was offered a

---

[12] Defendants object to statements in Plaintiff's Counter 56.1 Statement relying on this testimony, contending that Hill is testifying as to legal conclusions.  (Defs.' Cross 56.1 ¶¶ 34–35.)  However, as noted earlier, the Parties dispute whether Plaintiff was entitled to have an attorney with him and tell his side of the story at the meeting.  Because Hill was at that meeting, (*see* Aug. 14 Meeting Tr. 3), his perspective is admissible as opinion evidence based on his perception of whether circumstances were such that Plaintiff indeed could have had an attorney present or presented his side of the story.  *See* Fed. R. Evid. 701(a).

Plaintiff also cites portions of Hill's deposition transcript, however, in which Hill testifies, among other things, that a member has the right to a hearing before being removed under the bylaws, and that Plaintiff was not treated in a manner compliant with the bylaws.  (*See* Pl.'s Cross 56.1 ¶¶ 36–38; *see also* Hill Dep. Tr. 61–62.)  These are legal conclusions, and outside the ken of a lay witness.  *See, e.g.*, *Cameron v. City of N.Y.*, 598 F.3d 50, 54 (2d Cir. 2010) (describing the prohibition of witnesses "from testifying in the form of legal conclusions" as a "bedrock principle[] of evidence law").

"hearing" at which he could present "arguments and evidence in his defense." (Massucci Decl. Ex. P (Letter from Kelly to Maurer (Nov. 26, 2013)); *see also* Defs.' 56.1 ¶ 58; Pl's 56.1 ¶ 58; Defs.' Counter Cross 56.1 ¶ 13.) The next week, by letter dated December 6, 2013, Plaintiff through his attorney declined the offer, protesting that the "Board of Directors and/or the Fire Commissioners have rendered a decision without the minimal due process of prior notice and a right to be heard," and further stating that, "if the boards are unwilling to nullify their prior decision and provide an independent neutral fact finder, [Plaintiff's counsel] must advise [her] client to decline to participate." (Massucci Decl. Ex. Q (Letter from Maurer to Kelly (Dec. 6, 2013); *see also* Defs.' 56.1 ¶ 51; Pl's 56.1 ¶ 51; Defs.' Counter Cross 56.1 ¶ 14.)

The Parties, however, dispute exactly why Plaintiff was dismissed. The stated reason for Plaintiff's termination, however, was he engaged in conduct unbecoming of an officer and detrimental to the best interest of the Department, that his behavior was threatening in nature and intimidating to other members of the Department, and that his behavior was discourteous, obscene, and abusive toward fellow officers and members of the Fire Department. (*See* Aug. 15 Letter 2–3.) For their part, Defendants assert that Plaintiff was "expelled exclusively for his behavior and use of the derogatory racial slurs on the firehouse steps while in uniform and threatening an officer in violation of the Brewster Fire Department by-laws Article 12," and that Plaintiff "admits he was expelled for the use of derogatory and racially charged language." (Defs.' 56.1 ¶¶ 64–65 (citing Pl.'s Dep. Tr. 171–72; Bylaws; Aug. 15 Letter).) Plaintiff, however, disputes this while admitting that he received a letter stating that he was discharged for "conduct unbecoming," (*see* Pl.'s 56.1 ¶¶ 64–65 (citing Pl.'s Dep. Tr. 172; Aug. 15 Letter)), and Plaintiff further asserts, among other things, that no Department member has been expelled in the past 10 years except Plaintiff, that there is no record of a member being disciplined for the use of

a racial slur, that McMurray referred to an African-American member as a "nigger" in his presence, that Giambattisto testified to hearing racial slurs at the Department all the time, and that some Department members as well as Commissioner Richard Tofte ("Tofte") have used foul language.  (Pl.'s Counter 56.1, at unnumbered 49 ¶¶ 2, 3, 5, 7, 9, 15).  Moreover, Plaintiff asserts that the Silverblade was suspended in July 2013 for telling members and their guests to "get the fuck out" because some members were socializing instead of cleaning; that using the word "nigger" would not violate the bylaws unless the person to whom it was directed found it offensive; and that the bylaws are violated whenever a member uses racial slurs and someone complains, such that whether something violates the bylaws "depends on the subjective hearer and the tone."  (*Id.,* at unnumbered 49–51 ¶¶ 8, 10–14.)[13]

Plaintiff has further claimed that his freedom of speech was violated because he was speaking out on an issue of public concern, including that members were becoming increasingly unwilling to participate in the non-firefighting activities of a volunteer fire department.  (*See* Defs.' 56.1 ¶ 61; Pl's 56.1 ¶ 61.)  According to Plaintiff, posts appearing on the social networking website Facebook in or before July 2011 revealed that staff were boycotting coming to the firehouse.  (Pl.'s Dep. Tr. 161; Massucci Decl. Ex. S (Facebook posts).)  Plaintiff, however, stresses that his concerns were not limited to Michael's, Steven's, and DeBartoloemo's boycott of non-fire calls during Plaintiff's tenure as captain, but that he was also concerned that a number of the members who also worked in paid fire departments were unwilling to do fundraising and community service, and that Klosowski, the Chairman of the District,

---

[13] Additionally, citing to Goodwin's deposition transcript, Plaintiff asserts that the Department would not discipline a member who was involved in a racial hate crime, unless that conduct took place while the member was in full dress uniform and at the firehouse.  (Pl.'s Counter 56.1, at unnumbered 49 ¶ 6 (citing Goodwin Dep. Tr. 93–94).)

acknowledged that members refused to attend EMS calls so frequently that the District had been forced to hire paid workers in 2013 for the majority of each week, and that the District had been informed of this "public safety hazard" by the Chiefs of the Fire Department, (*see* Pl.'s 56.1 ¶ 61 (citing Klosowski Aff. ¶¶ 4, 5–7; Hill Dep. Tr. 31–33).

Nevertheless, to hear Defendants tell it, this was not the first occasion upon which Plaintiff was subject to disciplinary action: In a matter allegedly involving Plaintiff, Defendants assert that Plaintiff had been involved in a fist fight with O'Hara and was suspended for "conduct unbecoming" in connection with the incident.  (*See* Defs.' 56.1 ¶¶ 108, 110 (citing Miller Dep. Tr. 49–51).)  Plaintiff denies that he was suspended, however, noting that the Department has no record of Plaintiff being suspended for a fistfight with O'Hara.  (Pl.'s 56.1 ¶ 110 (citing Jacobs Dep. Tr. 172–73).)  Additionally, although they do not assert that he was disciplined as a result, Defendants claim that Plaintiff threatened Tim Sullivan, DeBartolomeo, and Crowley in the past.  (Defs.' 56.1 ¶ 109 (citing Miller Dep. Tr. 49–50).)  For his part, Plaintiff asserts that he has never been disciplined in any manner by the Department prior to the incident at hand.  (Pl.'s Cross 56.1 ¶¶ 23, 57 (citing Klosowski Dep. Tr. 19; Goodwin Dep. Tr. 41–42; Jacobs Dep. Tr. 37).)[14]

B.  Procedural History

On January 2, 2014, Plaintiff filed his Complaint against the Department, Rieg, Goodwin, Julie Kuklevsky ("Kuklevsky"), George Godfrey ("Godfrey"), McMurray, Jeff Bergstrom

---

[14] Defendants object that the cited testimony does not support the proposition for which Plaintiff cites it.  (Defs.' Cross 56.1 ¶¶ 23, 57.)  Conversely, Plaintiff objects to Defendants' statement on the grounds that Miller lacked personal knowledge to testify as to Plaintiff's earlier suspension.  (Pl.'s 56.1 ¶¶ 108–10.)  However, the question of whether Plaintiff was previously disciplined is, it turns out, immaterial for purposes of resolving these Motions.  Similarly, Defendants' assertions as to earlier expulsions of members of the Department, (*see* Defs.' 56.1 ¶¶ 97–99), to which Plaintiff objects on the basis of personal knowledge, (*see* Pl.'s 56.1 ¶¶ 97–99), likewise do not affect resolution of the instant Motions.

("Bergstrom"), David Beshears ("Beshears"), Dominick Consentino ("Consentino"), Jacobs, the District, Klosowski, Clair, R. Gerald Schramek ("Schramek"), Tofte, Miller, Michael, and Steven. (Dkt. No. 1.)  On March 20, 2014, the defendants—including several who have subsequently been dismissed from this case—filed their Verified Answer.  (Dkt. No. 4.)  By letter dated January 28, 2015, Defendants requested a pre-motion conference in advance of their anticipated Motion for Summary Judgment.  (Dkt. No. 25.)  The next day, Plaintiff also submitted a pre-motion letter, requesting a pre-motion conference in order to file a Motion for Summary Judgment on the Complaint's first cause of action, his due process claim.  (Dkt. No. 28.)  On January 30, 2015, Plaintiff submitted his response to Defendants' pre-motion letter, (Dkt. No. 30), and Defendants submitted their response to Plaintiff's on February 3, 2015, (Dkt. No. 32).  On March 11, 2015, the Court held a pre-motion conference, at which a briefing schedule for the Parties' Motions was set.  (Dkt. (minute entry for Mar. 11, 2015).)

On May 1, 2015, Defendants filed their Motion for Summary Judgment and accompanying papers.  (Dkt. Nos. 37–40.)  Prior to submitting his Motion for Summary Judgment, on May 13, 2015, Plaintiff filed a Motion for a Voluntary Dismissal of claims against Rieg, Kuklevsky, Godfrey, Bergstrom, Beshears, Consentino, Clair, Schramek, Tofte, and Michael, (Dkt. Nos. 41–42), which the Court granted the next day, (Dkt. No. 43).  On June 4, 2015, Plaintiff filed his Opposition to Defendants' Motion for Summary Judgment, (Dkt. No. 48), and, on June 8, 2015, his Motion for Partial Summary Judgment with accompanying papers, (Dkt. Nos. 50–53).  Defendants filed their Opposition to Plaintiff's Motion for Partial Summary Judgment and accompanying papers as well as their reply in support of their own Motion for Summary Judgment on June 25, 2015.  (Dkt. Nos. 54–56.)   On July 8, 2015, Plaintiff filed his Reply in support of his Motion for Partial Summary Judgment.  (Dkt. No. 57.)  On July 10, 2015,

Defendants submitted a letter to the Court concerning an argument made in Plaintiff's Reply, (Dkt. No. 59), which the Court denied as a sur-reply, (Dkt. No. 61).

## II.  Discussion

Defendants move for summary judgment on Plaintiff's due process, First Amendment retaliation, and his slander claims.  Plaintiff, in contrast, seeks summary judgment on his procedural due process claims.

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  Additionally, "[i]t is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Aurora Commercial Corp. v. Approved Funding Corp.*, No. 13-CV-230, 2014 WL 1386633, at *2 (S.D.N.Y. Apr. 9, 2014) (same).  "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. PriceWaterhouse*

*Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks

omitted).  Further, "[t]o survive a [summary judgment] motion . . . . , [a nonmovant] need[s] to

create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to

'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. Cty.*

*of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or

denials contained in the pleadings," *Walker v. City of N.Y.*, No. 11-CV-2941, 2014 WL 1244778,

at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, inter alia, *Wright v.*

*Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly

supported by documents or other evidentiary materials, the party opposing summary judgment

may not merely rest on the allegations or denials of his pleading . . . .")).

  "On a motion for summary judgment, a fact is material if it might affect the outcome of

the suit under the governing law."  *Royal Crown Day Care LLC v. Dep't of Health & Mental*

*Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted).  At summary

judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether

there are any factual issues to be tried."  *Brod*, 653 F.3d at 164 (internal quotation marks

omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, No. M21–88,

2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same).  Thus, a court's goal should be "to

isolate and dispose of factually unsupported claims."  *Geneva Pharm. Tech. Corp. v. Barr Labs.*

*Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 323–24 (1986)).

### B.  Analysis

#### 1.  Due Process

##### a.  Procedural Due Process

The United States Constitution forbids any "State [from] depriv[ing] any person of life, liberty, or property, without due process of law," U.S. Const. amend. XIV, § 1, an interdiction which binds volunteer fire departments, *see Janusaitis v. Middlebury Volunteer Fire Dep't*, 607 F.2d 17, 22–25 (2d Cir. 1979) (concluding that the actions of a local fire department constituted state action).  The Parties seek summary judgment on the question of whether the Department's actions comported with this constitutional guarantee.  (*See* Mem. of Law in Supp. of Defs.' Mot. ("Defs.' Mem.") 4–8 (Dkt. No 39); Pl.'s Mem. of Law in Supp. of his Mot. for Partial Summ. J. ("Pl.'s Cross Mem.") 7–15 (Dkt. No. 51).)[15]  They did not, and judgment in Plaintiff's favor is appropriate on this claim.

To begin, in order to "plead a violation of procedural due process, . . . a plaintiff must first identify a property right, second show that the government has deprived him of that right, and third show that the deprivation was effected without due process." *J.S. v. T'Kach*, 714 F.3d 99, 105 (2d Cir. 2013) (alteration, emphasis, and internal quotation marks omitted); *see also Chrebet v. Cty. of Nassau*, 24 F. Supp. 3d 236, 244 (E.D.N.Y. 2014) (same), *aff'd*, 606 F. App'x 15 (2d Cir. 2015).  The Second Circuit teaches that "[t]he threshold issue is always whether the plaintiff has a property . . . interest protected by the Constitution." *Morales v. New York*, 22 F. Supp. 3d 256, 276 (S.D.N.Y. 2014) (quoting *Narumanchi v. Bd. of Trs.*, 850 F.2d 70, 72 (2d Cir. 1988)).  "Such property interests cannot be found on the face of the Constitution, but rather 'are

---

[15] Plaintiff's Memorandum does not have page numbers; therefore, for ease of reference, the Court cites the ECF-generated page numbers found in the upper right-hand corner of his brief.

created, and their dimensions are defined by, existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits.'" *Looney v. Black*, 702 F.3d 701, 706 (2d Cir. 2012) (alterations omitted) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).  Thus, "[w]hen determining whether a plaintiff has a claim of entitlement, [courts] focus on the applicable statute, contract[,] or regulation that purports to establish" it.  *Brown v. New York*, 975 F. Supp. 2d 209, 242 (N.D.N.Y. 2013) (quoting *Martz v. Inc. Vill. of Valley Stream*, 22 F.3d 26, 30 (2d Cir. 1994)).  However, "[a] 'unilateral expectation' is not sufficient to establish a constitutionally protected property right." *Looney*, 702 F.3d at 706 (quoting *Roth*, 408 U.S. at 577).  "Rather, a plaintiff must have 'a legitimate claim of entitlement to' the alleged property interest."  *Id.* (quoting *Roth*, 408 U.S. at 577); *see also Harrington v. Cty. of Suffolk*, 607 F.3d 31, 34 (2d Cir. 2010) ("To have a property interest in a benefit, a person clearly must have more than an abstract need or desire and more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it." (quoting *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005))).

Here, the Parties apparently do not dispute that Plaintiff had a property interest in his position as a volunteer firefighter.  (*See* Pl.'s Cross Mem. 8 (arguing that Plaintiff had a property interest in his position as a volunteer firefighter); *see generally* Mem. of Law in Opp'n to Mot. for Summ. J. ("Defs.' Cross Opp'n") (Dkt. No. 54) (not arguing lack of property interest in Plaintiff's position).)  And for good reason: "[I]t is well-settled that in New York, volunteer firefighters are considered public employees and must be afforded due process in disciplinary proceedings . . . ."  *Reed v. Medford Fire Dep't, Inc.*, 806 F. Supp. 2d 594, 610 (E.D.N.Y. 2011) (internal quotation marks omitted); *see also Bigando v. Heitzman*, 590 N.Y.S.2d 553, 554 (App. Div. 1992) ("It is undisputed that volunteer firefighters are considered public employees and

27

must be afforded due process in disciplinary proceedings . . . .").  Additionally, there is no disputing that Plaintiff was deprived of this property interest when he was expelled from the Department.  *See Reed*, 806 F. Supp. 2d at 610 (finding a volunteer firefighter was deprived of property when he was discharged).

The next question, then, is "whether the government deprived the plaintiff of that interest without due process," an inquiry that "asks what process was due to the plaintiff, and inquires whether that constitutional minimum was provided in the case under review."  *Narumanchi*, 850 F.2d at 72 (citing *Mathews v. Eldridge*, 424 U.S. 319 (1976)).  As a general proposition, in conducting this inquiry, the Second Circuit has held that "[a]n employee who has a property interest in his employment"—like Plaintiff—"'is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story,' before he is subjected to the loss of employment," *Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 212 (2d Cir. 2002) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985)); *see also Amato v. Hartnett*, 936 F. Supp. 2d 416, 437 (S.D.N.Y. 2013) (same), although "procedural due process is satisfied if the government provides notice and a limited opportunity to be heard prior to termination, so long as a full adversarial hearing is provided afterwards," *Munafo*, 285 F.3d at 212 (quoting *Locurto v. Safir,* 264 F.3d 154, 171 (2d Cir. 2001)); *see also Amato*, 936 F. Supp. 2d at 437 (same).

Despite these general principles, "due process does not require the impossible," *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003) (citing *Zinermon v. Burch,* 494 U.S. 113, 128–29 (1990)), and "[w]here a deprivation at the hands of a government actor is 'random and unauthorized,' hence rendering it impossible for the government to provide a pre-deprivation hearing, due process requires only a post-deprivation proceeding," *id.* (citing *Hudson v. Palmer*,

468 U.S. 517, 534 (1984); *Parratt v. Taylor,* 451 U.S. 527, 541 (1981), *overruled in part on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986)), for which purposes an Article 78 proceeding may well be sufficient, *see Giglio v. Dunn*, 732 F.2d 1133, 1135 (2d Cir. 1984) (finding an employee who alleged he was coerced into resigning from his former job was "not deprived of due process simply because he failed to avail himself of the opportunity" to bring an Article 78 proceeding, where such proceeding "gave [him] a meaningful opportunity to challenge the voluntariness of his resignation").[16]  In contrast, "[w]hen the deprivation occurs in the more structured environment of established state procedures, rather than random acts, the availability of postdeprivation procedures will not, ipso facto, satisfy due process."  *Hellenic Am. Neighborhood Action Comm. v. City of N.Y. ("HANAC")*, 101 F.3d 877, 880 (2d Cir. 1996); *see also Dushane v. Leeds Hose Co. #1 Inc.*, 6 F. Supp. 3d 204, 214 (N.D.N.Y. 2014) ("[I]f an employee's termination is authorized by the state and therefore predictable, the availability of post-deprivation procedures will not, ipso facto, satisfy due process." (internal quotation marks omitted)).  This basic distinction "rests on pragmatic considerations."  *HANAC*, 101 F.3d at 880.  Indeed, "[w]hen a deprivation occurs because of a random, arbitrary act by a state employee '[i]t is difficult to conceive of how the [s]tate could provide a meaningful hearing before the deprivation takes place.'"  *Id.* (second alteration in original) (quoting *Hudson*, 468 U.S. at 532).

Thus, in order to determine what sort of process Plaintiff was entitled to, it is incumbent upon the Court to determine whether his firing was "random and unauthorized."  *DiBlasio*, 344 F.3d at 302 (internal quotation marks omitted).  "The controlling inquiry is solely whether the state is in a position to provide for predeprivation process," *HANAC*, 101 F.3d at 880 (internal

---

[16] Article 78 of the New York Civil Practice Law and Rules provides for special proceedings to obtain review of an act of a governmental body.  *See generally* N.Y. C.P.L.R. 7801–06.

quotation marks omitted), and, so, it makes sense to begin with the statute that, as the Parties rightly recognize, sets forth the procedures by which volunteer firefighters can be removed from their positions, (*see* Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n") 9 (Dkt. No. 48); Defs.' Cross Opp'n 4–7).  That statute in its entirety states:

> 1. The authorities having control of fire departments of cities, towns, villages and fire districts may make regulations governing the removal of volunteer officers and volunteer members of such departments and the companies thereof.

> 2. Such officers and members of such departments and companies shall not be removed from office, or membership, as the case may be, by such authorities or by any other officer or body, except for incompetence or misconduct.

> 3. Removals on the ground of incompetence or misconduct, except for absenteeism at fires or meetings, shall be made only after a hearing upon due notice and upon stated charges and with the right to such officer or member to a review pursuant to article seventy-eight of the civil practice law and rules.  Such charges shall be in writing and may be made by any such authority. The burden of proving incompetency or misconduct shall be upon the person alleging the same.

> 4. a. Hearings upon such charges shall be held by the officer or body having the power to remove the person charged with incompetency or misconduct or by a deputy or employee of such officer, or body designated in writing for that purpose. In a case where a deputy or other employee is so designated, he or she shall, for the purpose of such hearing, be vested with all the powers of such officer or body, and shall make a record of such hearing, which shall be referred to such officer or body for review within ninety days from the close of such hearing along with his or her recommendations.

> b. The notice of such hearing shall specify the time and place of such hearing and state the body or person before whom the hearing will be held.

> c. Such notice and a copy of such charges shall be served personally upon the accused officer or member at least ten days but not more than thirty days before the date of the hearing.

> d. A stenographer may be employed for the purpose of taking testimony at the hearing.

> 5. The officer or body having the power to remove the person charged with incompetence or misconduct may suspend such person after charges are filed and pending disposition of the charges, and after the hearing may remove such person or may suspend him or her for a period of time not to exceed one year.

> *The provisions of this section shall not affect the right of members of any fire company to remove a volunteer officer or voluntary member of such company for failure to comply with the constitution and by-laws of such company.*

N.Y. Gen. Mun. Law § 209-l (emphasis added).  Seizing on this last line, New York courts have made clear that the hearing guarantee contemplated by § 209-l(3) does not apply when charges are brought pursuant to a fire company's bylaws.  *See Armstrong v. Centerville Fire Co.*, 638 N.E.2d 959, 960 (N.Y. 1994) (observing that the "[p]etitioner was not statutorily entitled to a hearing before being expelled for having violated respondent's bylaws" and that "[t]he controlling statute (General Municipal Law § 209–l) only grants volunteer officers and volunteer members of fire departments the right to a hearing (upon written notice of charges) before being removed on the ground of incompetence or misconduct"); *Pawlowski v. Big Tree Volunteer Firemen's Co.*, 784 N.Y.S.2d 785, 786 (App. Div. 2004) ("Where . . . charges brought against volunteer firefighters concern a violation of the bylaws or constitution of the fire company, the firefighters are not entitled to a hearing."); *Ferrara v. Magee Volunteer Fire Dep't, Inc.*, 594 N.Y.S.2d 506, 507 (App. Div. 1993) ("[The] [p]etitioner was charged with a violation of the by-laws of the [d]epartment; therefore, General Municipal Law § 209–l does not apply.")

Although, to be sure, Plaintiff disputes that his conduct on the night in question is the actual reason he was terminated, there is no real dispute that he was at least procedurally removed from his position pursuant to the bylaws.  (*See* Aug. 15 Letter 3.)  Likewise, it is also clear that Article 12, § 1 of the Bylaws provide that "[t]he Board of Directors may remove a member from the roles of the [D]epartment, upon due notice via a registered letter form the recording secretary, for [a number of] reasons," including, "[f]or conduct unbecoming an officer, firefighter, or detrimental to the best interests of the department."  (*See* Bylaws Art. 12.)  Indeed, the letter that Plaintiff, through his counsel, sent to the Boards of Directors and Commissioners is

31

consistent with the notion that, procedurally speaking, Plaintiff was terminated in accordance with the Bylaws, inasmuch as the letter requests that the recipients "accept th[e] letter as [Plaintiff's] appeal . . . *pursuant to Article 12 Sec. 2 of the By-Laws*."  (Pl.'s Att'y's Letter (emphasis added).)

Defendants, however, characterizing Plaintiff's position as that Defendants failed to follow the bylaws and dictates of § 209-l, contend that Plaintiff's allegations amount to a claim that Defendants' acts were random and unauthorized, such that an Article 78 proceeding is sufficient.  (*See* Defs.' Cross Opp'n. 9–10.)  In support of this proposition, they cite *Byrne v. Ceresia*, 503 F. App'x 68 (2d Cir. 2012), a Second Circuit summary order affirming the district court's judgment that the plaintiff was not deprived of his procedural due process rights when fired from his position as court officer-captain for the New York State Office of Court Administration, reasoning that Plaintiff "d[id] not challenge [his employer's] established procedures for terminating disabled employees," but rather "claim[ed] that [the] [d]efendants failed to follow those procedures."  *Id.* at 69–70.  It is possible—and, indeed, tempting—to read *Byrne* broadly to suggest that, whenever a plaintiff alleges that he has been terminated in violation of the law, he must not possess a procedural due process claim because surely then his termination would have been random and unauthorized.  *Cf. Martinez v. O'Leary*, No. 11-CV-1405, 2013 WL 3356983, at *3 (E.D.N.Y. July 3, 2013) ("The Second Circuit has endorsed state court Article 78 review as a sufficient post-deprivation remedy in the context of a deprivation claim based on a change in employment status." (citing *Byrne*, 503 F. App'x at 69)); *Camhi v. Glen Cove City Sch. Dist.*, 920 F. Supp. 2d 306, 312 (E.D.N.Y. 2013) (concluding that the revocation of a teacher's tenure on the grounds that giving her tenure had been an ultra vires act was "random and unauthorized").  However, an argument that *Byrne* brings all illegal firings

within the purview of the so called "*Parratt-Hudson*" exception—or at least those not carried out by a "high-ranking official with final authority over significant matters," *see Byrne*, 503 F. App'x at 70 (quoting *DiBlasio*, 344 F.3d at 302)—overlooks the unique factual context in which *Byrne* was decided.  In *Byrne*, the Plaintiff was terminated through a letter that "failed to apprise him of (1) the reasons for his termination; (2) his right to contest the decision; (3) the process for contesting the decision; and (4) that, upon contesting the decision, his termination would be held in abeyance pending a final determination," *Byrne v. Ceresia*, No. 09-CV-6552, 2011 WL 5869594, at *2 (S.D.N.Y. Nov. 22, 2011), *aff'd*, 503 F. App'x 68 (2d Cir. 2012), despite 22 N.Y.C.R.R. § 25.27, the regulatory provision, which, according to the hearing officer in the case, governed the plaintiff's termination, *see id*; *see also* 22 N.Y.C.R.R. § 25.27(c).  In other words, in *Byrne*, the plaintiff was fired not because the defendants merely played fast and loose with the rules, but because they never took the rulebook off the shelf.  *See id.* at *4 (noting that the plaintiff alleged that "state officials acted in flagrant violation" of required procedures (internal quotation marks omitted)).  In such a scenario, "[i]t is difficult to conceive of how the [s]tate could provide a meaningful hearing before the deprivation takes place," *Hudson*, 468 U.S. at 532, because there is simply no basis to think that the defendants' conduct would have been any different had the applicable rules been different.

In contrast, here, there is a very real thread of logic uniting Plaintiff's termination with New York law: Section 209-l authorizes expulsion pursuant to the bylaws, and the bylaws permit expulsion for "conduct unbecoming" "upon due notice via a registered letter."  (*See* Bylaws Art. 12.)  In other words, it makes perfect sense to conclude here, that, in contrast with *Byrne*, had § 209-l or the bylaws been written differently, the relevant procedures followed in Plaintiff's expulsion may well have been different.  And, indeed, the Second Circuit itself has indicated that

a deprivation is less likely to be random and unauthorized when preceded by a hearing. *See Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 466 n.8 (2d Cir. 2006) ("[T]o the extent that the purpose of the *Parratt–Hudson* inquiry is to determine whether the government actor could have provided pre-deprivation process, that question must clearly be answered in the affirmative here, because the [b]oard actually conducted a hearing before [the action at issue].") Therefore, the Court declines to read *Byrne*—which, in any event, the Second Circuit considered sufficiently short of revolutionary to merit summary affirmance—as dispositive here.

Rather, the more relevant case law comprises those decisions which directly confront the issue of whether an allegedly wrongful termination made pursuant to § 209-l requires a pre-deprivation hearing. In *Dushane v. Leeds Hose Co. #1 Inc.*, 6 F. Supp. 3d 204 (N.D.N.Y. 2014), a case in which a volunteer firefighter was suspended for the stated reason that he made "a derogatory sexual reference to a female member under the age of eighteen," and ultimately terminated "due to multiple counts of insubordination," the court concluded that, because "[the] [d]efendants acknowledge[d] that [the] [p]laintiff was removed for his violation of [the department's] by-laws," and because § 209-l does not affect a department's ability to remove volunteer members pursuant to department bylaws, the plaintiff's termination could not be labeled as "random and unauthorized." 6 F. Supp. 3d at 208, 215 (internal quotation marks omitted).[17] This was so, even though, as the court later noted at the summary judgment stage,

---

[17] *Dushane* was decided upon a Motion to Dismiss, but the difference in procedural posture does not suggest that Plaintiff is any less entitled to judgment as a matter of law at this stage.

Moreover, at the summary judgment stage of the *Dushane* case, the court concluded that Plaintiff was not terminated due to a "random and unauthorized act," noting that there was "[no] evidence that suggest[ed] that [the] board of directors lacked the authority to suspend or terminate [the] plaintiff." *See Dushane v. Leeds Hose Co. #1 Inc.*, No. 13-CV-677, at *19 (N.D.N.Y. Feb. 22, 2016).

the plaintiff firefighter claimed that he "had no opportunity 'to present his side of the story,'"

insofar as he was permitted to receive notice and an opportunity to be heard before his suspension

only with respect to the alleged sexually derogatory statement, and not with respect to the counts of

insubordination, for which he was also, ultimately, terminated.  *See Dushane v. Leeds Hose Co. #1*

*Inc.*, No. 13-CV-677, at 22–23 (N.D.N.Y. Feb. 22, 2016).

Similarly, in *Reed v. Medford Fire Department*, 806 F. Supp. 2d 594 (E.D.N.Y. 2011),

the plaintiff volunteer firefighter received a letter informing him that he was suspended for

violating the department's sexual harassment policy until the department's next general meeting

on March 7.  *Id.* at 600.  On March 7, the fire department sent the plaintiff a notice that the

charges against him would be considered at a meeting pursuant to § 209-l and the department's

bylaws on March 26, but nonetheless voted through its members to find the plaintiff guilty and to

withdraw notice of that meeting.  *Id.*  After the plaintiff brought a successful Article 78

proceeding, a New York Supreme Court justice ordered that the department conduct a hearing in

accordance with § 209-l and the department's bylaws, which was eventually held in December.

*Id.* at 601–02.  In addressing the defendants' motion for summary judgment on the plaintiff's

subsequent procedural due process claim, the court found a dispute of material fact surrounded

whether the department's conduct in terminating the plaintiff was "random and unauthorized."

*See id.* at 611.  In so doing, the court expressly noted that "the fact that the [p]laintiff contends

that the . . . [d]efendants['] actions violated the municipal law and [d]epartment by-laws does not

require a finding that the Medford [d]efendants['] conduct was 'random and unauthorized.'"  *Id.*

at 612.  Therefore, to the extent that Plaintiff was terminated without a pre-deprivation hearing of

some kind, he was denied due process.  *Cf. Dushane*, 6 F. Supp. 3d at 216–17 ("[A]s alleged,

[the plaintiff] did not receive oral or written notice of all of the charges against him.  [The]

[p]laintiff has therefore sufficiently alleged that the pre-suspension and pre-termination process

he received was inadequate." (citation omitted)); *Leonardi v. Bd. of Fire Comm'rs of Mastic Beach Fire Dist.*, 643 F. Supp. 610, 613 (E.D.N.Y. 1986) ("[T]he . . . failure [by the board of fire commissioners] to provide [the plaintiff volunteer firefighter] with a pre-termination hearing constitutes a deprivation of a property interest without the due process of law guaranteed by the Fourteenth Amendment.").

Having concluded that Plaintiff was entitled to a pre-termination proceeding of some kind, there remains the question of what process was due. While "[t]he pretermination process 'need not be elaborate' or approach the level of a 'full adversarial evidentiary hearing,'" *Otero v. Bridgeport Hous. Auth.*, 297 F.3d 142, 151 (2d Cir. 2002) (quoting *Loudermill*, 470 U.S. at 545)); *see also Reed*, 806 F. Supp. 2d at 612 (same), it is well established that "due process does require that before being terminated such an employee be given oral or written notice of the charges against h[im], an explanation of the employer's evidence, and an opportunity to present h[is] side of the story," *Otero*, 297 F.3d at 151 (alterations, emphasis, and internal quotation marks omitted); *see also Locurto*, 264 F.3d at 174 (same); *Reed*, 806 F. Supp. 2d at 612 (same). Nevertheless, as noted, "procedural due process is satisfied if the government provides notice and a limited opportunity to be heard prior to termination, so long as a full adversarial hearing is provided afterwards." *Locurto*, 264 F.3d at 171. Because an Article 78 proceeding is sufficient for purposes of this latter requirement, *see id.* at 174, the question become Plaintiff had notice and a "limited opportunity to be heard prior to termination."

Here, a reasonable jury would not have a sufficient evidentiary basis to conclude that he did. Although due process does not demand "actual notice before the government may extinguish a person's property interest," it does "require[] the government to provide notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency

36

of the action and afford them an opportunity to present their objections." *Reed*, 806 F. Supp. 2d at 614 (internal quotation marks omitted). There is no question that Plaintiff was not sent formal notice of either of the July 30, 2013 or the August 14, 2013 Board meetings. (*See* Pl.'s Cross 56.1 ¶¶ 27, 29; Defs.' Cross 56.1 ¶¶ 27, 29.) And although Rieg spoke to Plaintiff before he was suspended, Plaintiff has testified that the only person who informed Plaintiff prior to his expulsion that he might be removed from the Department was Dexter. (*See* Pl.'s Dep. Tr. 130–31, 137.) While Defendants object to Plaintiff's claim that he was "not provided notice" of the July 30, 2013 or August 14, 2013 Board meetings by asserting that Plaintiff "can only attest to that which is in his personal knowledge and cannot attest to what the Brewster Fire Department or the Brewster-Southeast Joint Fire District did or did not do," (Defs.' Cross 56.1 ¶¶ 27, 29), and further deny Plaintiff's assertion that he "was not provided notice of the charges and evidence against him prior to expulsion," (Defs.' Cross 56.1 ¶ 40 (citing Pl.'s Dep. Tr. 127–28; Goodwin Dep. Tr. 14–15)), they offer no evidentiary support to indicate that Plaintiff in fact was afforded such notice.[18] This is not enough. To the contrary, "Defendants had the burden to show

---

[18] Indeed, the evidence that Defendants cite in denying that Plaintiff did not have notice of the charges and the evidence against him does not support that proposition. The first piece of evidence that Defendants cite is a portion of Plaintiff's deposition transcript which reads:

Q.  Where did you actually have the conversation with [Rieg]?

A.  In the chief's office.

Q.  Was it just you and him?

A.  Yes.

Q.  Can you tell me the sum and substance of that conversation?

A.  He asked me if I called the Millers a bunch of niggers.

Q.  What did you respond?

that . . . Plaintiff received constitutionally adequate notice," *Reed*, 806 F. Supp. 2d at 614, and, absent any basis to conclude he did (apart from speculation as to what Plaintiff may have surmised from his conversation with Rieg), a reasonable jury could not conclude that Defendants complied with the dictates of due process, *see Oladokun v. Ryan*, No. 06-CV-2330, 2010 WL 3910578, at *7 (S.D.N.Y. Sept. 30, 2010 ("Because the essential principle of due process is that the deprivation of a protected interest be preceded by notice and an opportunity to be heard, it is axiomatic that the notice provided must accurately relate when and where the absentee may contest the deprivation." (citation omitted) (citing, inter alia, *Loudermill,* 470 U.S. at 542)); *cf. also Reed*, 806 F. Supp. 2d at 613 ("The [p]laintiff's contention that he did not receive constitutionally adequate notice of the [pre-termination] [h]earing, if true, would render the pre-termination hearing void.").

      Even if the notice was adequate, however, a jury could not reasonably conclude on the evidence presented that Plaintiff had an opportunity to be heard before termination.  Despite

---------------

A.  Yes.

Q.  Was any more detail regarding the circumstances of you calling the Millers niggers discussed?

A.  No.

Q.  Did Chief Rieg ask you anything else?

A.  No.

Q.  Was there any more to the conversation other than what you just told me?

A.  No.

(Pl.'s Dep. Tr. 127–28.)  Similarly, the second piece of Defendants' evidence is an excerpt from Goodwin's deposition transcript, which does not have to do with Plaintiff's notice.  (*See* Goodwin Dep. Tr. 14–15.)

some noises from Defendants that Plaintiff could have inserted himself into the August 14
meeting, (*see, e.g.*, Defs.' Cross Opp'n 6 ("Plaintiff mentions numerous times in his motion
papers that [he] was not permitted to be heard . . . . [T]here is no evidence that Chief R[ie]g
prevented Plaintiff from explaining or defending himself."); Mem. of Law in Reply to Pl.'s
Opp'n to Defs.' Mot. for Summ. J. ("Defs.' Reply") 1 (Dkt. No. 55) ("[T]here is no evidence that
Chief R[ie]g prevented Plaintiff from explaining or defendant himself.")), there is no question
that the August 14 meeting was the regular Board of Commissioners meeting, (Defs.' 56.1 ¶ 83;
Pl.'s 56.1 ¶ 83), which was adjourned in favor of the Directors meeting of the same date.  And
while there is at least some evidence in the record demonstrating that at least one person present
at the August 14 meeting felt as though Plaintiff was expelled without the opportunity to share
his side of the story, (*see* Hill Dep. Tr. 60 ("I just didn't understand how you could possibly do
that [i.e., expel Plaintiff] without even letting the man have anything to say as to what happened.
I thought this was America.")), Defendants cite no evidence in the record when objecting to
Plaintiff's assertion that he was not allowed to participate in a hearing before being expelled, (*see*
Defs.' Cross 56.1 ¶ 39).  Defendants may not substitute their speculation in place of some
reason—rooted in the evidentiary record—to believe that Plaintiff not only had notice of the
August 14 meeting, but could also have been heard at it.  *See, e.g.*, *Major League Baseball
Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008) ("A party opposing summary
judgment does not show the existence of a genuine issue of fact to be tried merely by making
assertions that are conclusory or based on speculation." (citation omitted)).[19]

---

[19] Similarly, Plaintiff's earlier conversation with Rieg cannot count as Plaintiff's
opportunity to be heard for *Loudermill* purposes.  Although there are cases where an informal
conversation between an employee and a supervisor discharges the public employer's obligation
to afford a chance to be heard prior to termination, *see, e.g.*, *Powell v. Mikulecky*, 891 F.2d 1454,
1455, 1459 (10th Cir. 1989); *Douglas v. Lexington-Fayette Urban Cty. Gov't*, No. 06-CV-143,

<u>b.  Substantive Due Process</u>

In addition to the Parties' cross motions for summary judgment on Plaintiff's procedural due process claim, Defendants also seek dismissal of Plaintiff's substantive due process claim. (*See* Defs.' Mem. 8–10.)  Reviewing Plaintiff's Complaint, it is not even clear that he brought a substantive due process claim, (*see generally* Compl. (Dkt. No. 1)), and Plaintiff does not seem to oppose Defendants' Motion on such a ground, (*see generally* Pl.'s Opp'n).  However, to the extent the Parties understand the Complaint to have asserted a claim for substantive due process, the Court agrees that it must fail.

"Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill advised."  *Cunney v. Bd. of Trustees*, 660 F.3d 612, 626 (2d Cir. 2011) (internal quotation marks omitted).  "In order to shock the conscience and trigger a violation of substantive due process, official conduct must be outrageous and egregious under the circumstances; it must be truly brutal and offensive to human dignity."  *Lombardi v. Whitman*, 485 F.3d 73, 81 (2d Cir. 2007) (internal quotation marks omitted); *see also Velez v. Levy*, 401 F.3d 75, 93–94 (2d Cir. 2005) (noting that actions which shock the conscience occur "largely in the context of excessive force claims," but also unquestionably include other "malicious and sadistic abuses of power by government officials, intended to oppress or to cause injury and designed for no legitimate government purpose" (internal quotation marks omitted)); *Schultz v. Inc. Vill. of Bellport*, No. 08-CV-930, 2010 WL 3924751, at *6 (E.D.N.Y. Sept. 30, 2010)

---

2007 WL 4365416, at *2 (E.D. Ky. Dec. 12, 2007), here, it was the Board—not Rieg—that had the power to expel Plaintiff, and, in any event, that conversation did not raise the prospect of expulsion and came before the decision to terminate Plaintiff, (*see* Pl.'s Dep. Tr. 137 (indicating that the conversation with Dexter was the only one in which Plaintiff was informed he may be expelled)).

(noting that the shock the conscience standard "is not easily met; the plaintiff must show the government conduct was egregious and outrageous, not . . . merely incorrect or ill-advised." (quoting *Ferran v. Town of Nassau*, 471 F.3d 363, 369–70 (2d Cir. 2006)) (footnote and internal quotation marks omitted)), *aff'd*, 479 F. App'x 358 (2d Cir. 2012).  When bringing a substantive due process claim for deprivation of a property right, in addition to establishing, as Plaintiff has, the existence of a valid property right, a plaintiff must also "demonstrate that the defendant acted in an arbitrary or irrational manner in depriving him of that property interest."  *Crowley v. Courville*, 76 F.3d 47, 52 (2d Cir. 1996).  Nevertheless, "where a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process."  *Velez*, 401 F.3d at 94; *see also Miller v. N.Y.C. Dep't of Educ.*, 71 F. Supp. 3d 376, 385 (S.D.N.Y. 2014) (same), *aff'd*, 622 F. App'x 38 (2d Cir. 2015); *Rother v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 970 F. Supp. 2d 78, 100 (N.D.N.Y. 2013) (dismissing substantive due process claim where it "s[ought] to remedy the same harm and challenge[d] the same conduct" as the plaintiff's procedural due process claim); *Roman v. Velleca*, No. 11-CV-1867, 2012 WL 4445475, at *10 (D. Conn. Sept. 25, 2012) ("[S]ubstantive due process claims must be dismissed where they are merely duplicative of claims explicitly protected under other constitutional sources.").

Here, the overwhelming majority of Plaintiff's claims fall into ambit of other provisions of the Constitution—specifically, the First Amendment and the Due Process Clause of the Fourteenth Amendment—thereby closing off his ability to seek relief by invoking the concept of substantive due process.  *See Velez*, 401 F.3d at 94.  But more fundamentally still, Plaintiff has not alleged facts significantly egregious as to shock the conscience.  *See Cunney*, 660 F.3d at 626.  In any event, it is hardly irrational that a fire department—an organization charged with

41

protecting the safety of the community, *cf. Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834

F.2d 54, 58 (2d Cir. 1987) ("[T]he government has a legitimate interest in the smooth

functioning of a public facility and, especially, in preserving the 'esprit de corps' that is essential

to a fire department's joint endeavor of saving lives." (citing *Janusaitis,* 607 F.2d at 26))—would

want to take swift action to censure a member of its ranks who indisputably referred to his

colleagues as "niggers," *cf. Swinton v. Potomac Corp.*, 270 F.3d 794, 817 (9th Cir. 2001) (noting

that the word "nigger" is "perhaps the most offensive and inflammatory racial slur in English, a

word expressive of racial hatred and bigotry." (alterations and internal quotation marks

omitted)).  Therefore, his substantive due process claim—to the extent that he brought one—

must fail.

### c.  Who Is Liable?

Defendants also argue that, even if Plaintiff prevails on his due process claims, the

District, its Commissioners, and McMurray cannot be held liable because Plaintiff was

discharged not by those Defendants, but by the Department's Board of Directors.  (Defs.' Mem.

3–4.)  Likewise, Defendants argue that Goodwin, Jacobs, and Klosowski are entitled to qualified

immunity.  (*Id.* at 1–3.)

At this stage, a refresher as to who the Defendants are and their titles would likely be

helpful.  Following voluntary dismissal of certain defendants from this case, (*see* Dkt. No. 43),

the Defendants that remain in this case are the Department, the District, Goodwin, McMurray,

Jacobs, Klosowski, Miller, and Steven.  Goodwin and Jacobs are both members of the Board of

Directors. (Aug. 14 Meeting Tr. 3.)  Klosowski is a member of the Board of Commissioners.

(*Id.* at 2.)  McMurray, the person with whom Plaintiff was speaking when, according to

Defendants, Plaintiff repeatedly exclaimed the word "nigger" while outside, was a member of

Department, but not a member of the Board of Directors or the Board of Commissioners.  (Defs.'
56.1 ¶ 94; Pl.'s 56.1 ¶ 94; *see also* Aug. 14 Meeting Tr. 3, 86 (noting members of Board of
Directors in attendance but not identifying McMurray, despite presence at meeting); Goodwin
Dep. Tr. 104 ("Q.  Is Mr. McMurray a member of the fire district board of commissioners?  A.
No.").)  Miller and Steven are both members of the Department.  (Miller Dep. Tr. 14 (identifying
Steven as a member of the Department); Miller Letter 1 (letter from Miller indicating that he is a
member of the Department).)  Goodwin and Jacobs are both members of the Board of Directors.
(Defs.' 56.1 ¶ 90; Pl.'s 56.1 ¶ 94; Pl.'s Cross 56.1 ¶¶ 6–9; Defs.' Cross 56.1 ¶¶ 6–9.)

### i.  The District

To begin, the District can properly be held responsible for violating Plaintiff's Due
Process rights.[20]  Defendants argue that it cannot be, because the District had "no quorum . . . on
August 14, 2013 to take action related to [Plaintiff's] action."  (Defs.' Mem. 4.)  Plaintiff,
however, responds that the District is liable because it (1) is responsible for the violations of its
"employees," (2) is inextricably intertwined with the Department, and (3) shares "concurrent
authority" with the Department for purposes of § 209-l.  (*See* Pl.'s Opp'n 11–14.)  In its reply,
Defendants do not specifically respond to these points, instead arguing why Klosowski and the
other individual Defendants are not liable.  (*See* Defs.' Reply 4–5.)

---

[20] It bears noting that the District can be sued because it is a political subdivision of the
State of New York.  *See Mancuso v. N.Y. State Thruway Auth.*, 86 F.3d 289, 292 (2d Cir. 1996)
("[T]he Eleventh Amendment does not apply to suits against counties, municipal corporations,
and other political subdivisions . . . ."); *Mangino v. Inc. Vill. of Patchogue*, 739 F. Supp. 2d 205,
259 n.44 (E.D.N.Y. 2010) ("[T]he [f]ire [d]istrict is a separate political subdivision."),
*reconsideration granted in part on other grounds*, 814 F. Supp. 2d 242 (E.D.N.Y. 2011); *Keller
v. Niskayuna Consol. Fire Dist. 1*, 51 F. Supp. 2d 223, 227 (N.D.N.Y. 1999) ("The Fire District
is . . . a political subdivision . . . .").  (*See also* Pl.'s Cross 56.1 ¶ 14 (indicating that the "District
is and was a political subdivision of the State of New York"); Defs.' Cross 56.1 ¶ 14 (admitting
the same).)

The Court agrees that the District may be held liable.  Claims against a New York fire district are analyzed under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) and its progeny.  *See Lozada v. Weilminster*, 92 F. Supp. 3d 76, 106–07 (E.D.N.Y. 2015) (considering *Monell* claim against fire district, but rejecting the claim on the merits); *Fotopolous v. Bd. of Fire Comm'rs of Hicksville Fire Dist.*, 11 F. Supp. 3d 348, 372–75 (E.D.N.Y. 2014) (same); *see also Klemow v. City of Kingston*, No. 84-CV-1477, 1987 WL 28138, at *3 (N.D.N.Y. Dec. 17, 1987) ("In [*Monell*] . . . , the Supreme Court held that . . . political subdivisions of the state can be held liable as 'persons' under § 1983 for civil rights[] violations caused by their official policies, or customs.").

"Congress did not intend municipalities"—or, for that matter, fire districts—"to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort."  *Monell*, 436 U.S. at 691; *see also Fotopolous*, 11 F. Supp. 3d at 373 (same).  Therefore, a defendant in a *Monell* action "can be held liable under [§] 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality."  *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012); *Berk v. City of N.Y.*, No. 13-CV-3917, 2015 WL 7162239, at *3 (S.D.N.Y. Nov. 9, 2015) (same).  "Absent such a custom, policy, or usage, a municipality cannot be held liable on a respondeat superior basis for the tort of its employee."  *Jones*, 691 F.3d at 80 (italics omitted); *Berk*, 2015 WL 7162239, at *3 (same).  Put differently, a *Monell* defendant may not be liable under § 1983 "by application of the doctrine of respondeat superior."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (italics omitted); *see also Moroughan v. Cty. of Suffolk*, 99 F. Supp. 3d 317, 326 (E.D.N.Y. 2015) ("[A] municipal entity may only be held liable where the entity itself commits a wrong . . . ." (emphasis omitted)).  Instead, there must be a "direct causal link between a municipal policy or

custom and the alleged constitutional deprivation."  *City of Canton, Ohio v. Harris*, 489 U.S.

378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988)

("[G]overnmental bodies can act only through natural persons, . . . [and] governments should be

held responsible when, and only when, their official policies cause their employees to violate

another person's constitutional rights.").  In other words, in order "[t]o hold a city liable under

§ 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove

three elements:  (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3)

a denial of a constitutional right."  *Wray v. City of N.Y.*, 490 F.3d 189, 195 (2d Cir. 2007)

(internal quotation marks omitted); *see also Lamont v. Wilson*, No. 14-CV-5052, 2015 WL

5003558, at *6 (S.D.N.Y. Aug. 20, 2015) ("Courts in th[e] [Second] Circuit apply a two prong

test for § 1983 claims brought against a municipal entity.  First, the plaintiff must prove the

existence of a municipal policy or custom in order to show that the municipality took some

action that caused his injuries beyond merely employing the misbehaving officer.  Second, the

plaintiff must establish a direct causal link between a municipal policy or custom and the alleged

constitutional deprivation." (citations and internal quotation marks omitted)).

There is no question that the bylaws by which the Department is governed are approved

by the Board of Fire Commissioners.  (*See* Bylaws; *see also* Pl.'s Cross 56.1 ¶ 17; Defs.' Cross

56.1 ¶ 17.)  Likewise, the bylaws unambiguously amount to a "policy or custom" within the

meaning of *Monell* jurisprudence because they are, of course, a formal policy endorsed by the

District.  *See, e.g.*, *Calicchio v. Sachem Cent. Sch. Dist.*, No. 14-CV-5958, 2015 WL 5944269, at

*10 (E.D.N.Y. Oct. 13, 2015) (noting that a policy or custom may be shown by the "existence of

a formal policy which is officially endorsed by the municipality"); *see also Lamont*, 2015 WL

5003558, at *6 (same).  Finally, it has already been established that enforcement of the bylaws

was the cause for Plaintiff's procedurally unconstitutional expulsion from the Department. Therefore, the only question—at least from Defendants' perspective—is whether the fact that the meeting of the Board of Commissioners was disbanded for want of quorum insulates the District from liability.

Several factors militate in favor of concluding that the District is liable even though the Department's Board of Directors did the firing. First, a number of cases involving *Monell* claims relating to terminated firefighters have considered whether the entity sued had authority over the fire company's personnel. In *Yeager v. City of McGregor*, for instance, the Fifth Circuit concluded that firefighters who alleged that they were unconstitutionally terminated could not bring a *Monell* claim because the municipal defendant did not, in the first instance, hold authority to regulate the membership of the fire department. *See* 980 F.2d 337, 343 (5th Cir. 1993).[21] Likewise, in *Mark v. Borough of Hatboro*, the Eastern District of Pennsylvania concluded that the plaintiff could not bring a § 1983 action against a municipality over the practices used to determine membership in a fire company, because "[t]he [fire] [c]ompany [was] a private, autonomous association," the "membership screening practices" of which the municipal defendant "ha[d] absolutely no control." 856 F. Supp. 966, 976 (E.D. Pa. 1994), *aff'd*, 51 F.3d 1137 (3d Cir. 1995). In contrast, here, the *Monell* defendant—that is, the District—had precisely that power. That is true not only because the Parties do not contest that it approved the very bylaws by which firefighters are removed, (*see* Bylaws; *see also* Pl.'s Cross 56.1 ¶ 17; Defs.' Cross 56.1 ¶ 17), but because other courts have expressly so held. Indeed, courts have held that, where bylaws provided for a fire department to discipline its members, the delegation

---

[21] In *Yeager*, however, the Fifth Circuit also concluded that the volunteer fire department was not a state actor. *See* 980 F.2d at 343.

of authority to discipline members is concurrent as between the fire department and fire district. *See Reed*, 806 F. Supp. 2d at 611–12 (noting that the defendant fire department and fire district "were delegated the authority to . . . terminat[e] . . . the [p]laintiff for cause," and that "to the extent the [b]oard of [f]ire [c]ommissioners delegated this responsibility in whole or in part to the [fire] [d]epartment, this is considered a 'grant of concurrent authority'" (quoting *Acker v. Bd. of Fire Comm'rs, Kings Park Fire Dist.*, 269 N.Y.S.2d 628, 630 (App. Div. 1966)).  This logic supplies the missing ingredient in *Yeager* and *Mark*, suggesting that the instant case is precisely the sort in which a plaintiff may maintain a § 1983 suit over a fire department personnel decision.  *Cf. Armstrong*, 638 N.E.2d at 960 (noting that § 209-l "only grants volunteer officers and volunteer members of fire departments the right to a hearing . . . before being removed on the ground of incompetence or misconduct," and that "[t]he Legislature did not intend thereby to interfere with the disciplining of volunteer firefighters in connection with the conduct of the internal affairs of a fire company"); *Shafer v. Bd. of Fire Comm'rs, Selkirk Fire Dist.*, 967 N.Y.S.2d 491, 492 (App. Div. 2013) (indicating that the respondent board of fire commissioners for a fire district "issued a notice of charges against [the] petitioner alleging that he had engaged in misconduct, including violations of the [f]ire [d]epartment's bylaws," and subsequently expelling the petitioner).

This law is of particular relevance for *Monell* purposes.  As one court explained in considering a *Monell* claim against a Connecticut fire district,

> [i]n *Praprotnik*, a plurality of the Supreme Court set forth four requirements which must be met so that a single act may suffice to establish a municipal policy which is unconstitutional.  First, it must be an act which the municipality has "officially sanctioned or ordered."  Second, only officials with "final policymaking authority" may subject the municipality to liability through their actions.  Third, state law determines whether an official or panel has final authority.  Fourth, the act must have been taken "pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business."

*Massaro v. Allingtown Fire Dist.*, No. 03-CV-136, 2006 WL 1668008, at *6 (D. Conn. June 16, 2006) (emphasis omitted) (citing *Praprotnik*, 485 U.S. at 123).  There, the court concluded that *Monell* liability could lie as to a fire district where the board of fire commissioners allegedly discriminated against the plaintiff on the basis of race by promoting a person of a different race than the plaintiff to the position of fire chief.  *Id.* at *1–2, *7.  The court reasoned that the board was statutorily charged with appointing all positions in the department, that the board was the policymaking authority for the department in terms of appointing, disciplining, and removing members, that Connecticut law "state[d] as such," and that the board was the policymaking authority for the area of appointing, disciplining, and removing persons within the fire department.  *Id.* at *7.  Here, there is no question that the District approved the bylaws, and that it had authority to control the conduct of the firefighters.  *See Reed*, 806 F. Supp. 2d at 611.  Therefore, the District's adoption of the bylaws is sufficient to support *Monell* liability.[22]

---

[22] The Court recognizes that the bylaws are hardly a model of clarity; however, there can be little doubt that their wording expressly contemplates—or that the bylaws were understood to contemplate—the ability of the Board of Directors to expel a member without a prior opportunity to be heard.  Specifically, Article 12, Section 1 provides only that "[t]he Board of Directors may remove a member from the rolls of the Department, upon due notice via a registered letter from the recording secretary," for certain enumerated reasons.  (*See* Bylaws Art. 12, § 1.)  Plaintiff's expulsion letter makes clear that it was delivered "by . . . registered mail," (*see* Aug. 15 Letter 1), and was signed by Kuklevsky, who is identified as the "Recording Secretary," (*see id.* at 4).  In contrast, it is only "[u]pon written request" that a member is "entitled to a hearing, whereupon arguments and evidence may be presented," and "at least one week prior" to such hearing that "[h]e/she shall receive . . . written charges."  (*See* Bylaws Art. 12, § 2.)  Again, this understanding is confirmed by Plaintiff's expulsion letter (*see* Aug. 15 Letter 3–4 (noting that Board members, "[i]n accordance with Article 12, Section 2 of the . . . By-Laws," voted to expel Plaintiff "effective the date of this letter," and further informing Plaintiff that "[p]ursuant to Article 12, Section 2 of the Department's By-Laws, upon written request, [Plaintiff] [would be] entitled to a hearing whereupon arguments and evidence may be presented in [his] defense").  Additionally, such an understanding is further corroborated by the fact that, when Plaintiff through counsel submitted his "appeal . . . pursuant to Article 12 Sec. 2 of the By-Laws," (Pl.'s Atty's Letter 1), Plaintiff was "advised that in accordance with Article 12 of the Bylaws . . . , the Board of Commissioners [was] prepared to hold a hearing" upon one of two dates "wherein

ii.  Klosowski

Plaintiff has not, however, established Klosowski's liability.  It is well established that "vicarious liability is inapplicable to § 1983 suits," and, therefore, "the personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Victory v. Pataki*, —F.3d—, 2016 WL 373869, at *13 (2d Cir. Feb. 24, 2016) (ellipses and internal quotation marks omitted omitted).  And while there is authority for the proposition that "[t]he personal involvement of a supervisory defendant may be shown by evidence that . . . the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom," *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995), there is no basis to conclude such is the case with Klosowski.  While Klosowski is in at least his sixteenth year as fire commissioner, (*see* Klosowski Aff. ¶ 2), and the bylaws were approved in 2011, (*see* Bylaws), any suggestion that he thereby is responsible for the policy is simple speculation.  However, that is not enough to defeat Klosowski's Motion, as "when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *CILP Assocs., L.P*, 735 F.3d at 123 (alteration omitted).  Perhaps recognizing this, Plaintiff argues that Klosowski is personally liable

> in that he was aware that [Plaintiff] had no prior disciplinary history, that more egregious events have taken place beyond calling someone names without the member being expelled, that two years previously [sic], and that Michael Miller had been provided a full pre-termination hearing including all of the protections described in GML §209l and the US Constitution.

---

[Plaintiff] may offer arguments and evidence in his defense," (Massucci Decl. Ex. P (Letter from Kelly to Maurer (Nov. 26, 2013) 2).  Finally, although of course not evidence for purposes of summary judgment, it is at least conceptually instructive that Defendants themselves argue that "Article 12 Section 2 . . . provides a mechanism for the *expelled member* to dispute/appeal the expulsion," (*see* Defs.' Mem. 6 (emphasis added)), instead of contending that the Bylaws, despite their wording and construction, embody the dictates of due process as described herein.

(Pl.'s Opp'n 14 (citations omitted).)  This argument, however, goes plainly to the question of the propriety of Plaintiff's expulsion, an issue which is beside the point of whether Klosowski was sufficiently involved in the procedural due process violations that accompanied Plaintiff's expulsion.  Therefore, Klosowski cannot be held liable.

### iii.  McMurray

Defendants assert, without analysis, that McMurray cannot be held liable because he did not discharge Plaintiff.  (Defs.' Mem. 3–4.)  Plaintiff in his opposition does not seem to seriously argue otherwise.  That makes sense, because Defendants are correct.  McMurray was a member neither of the Board of Commissioners nor the Board of Directors.  (Defs.' 56.1 ¶ 94; Pl.'s 56.1 ¶ 94; *see also* Aug. 14 Meeting Tr. 3, 86 (noting Board members in attendance but not identifying McMurray, despite presence at meeting); Goodwin Dep. Tr. 104 ("Q.  Is Mr. McMurray a member of the fire district board of commissioners?  A.  No.").)  As such, he did not expel Plaintiff from the Department, and, consequently, did not deprive him of procedural due process.[23]

### iv.  Qualified Immunity for Jacobs, Goodwin, and Klosowski

Defendants also argue that Jacobs, Goodwin, and Klosowski are immune from suit under the doctrine of qualified immunity.[24]  Qualified immunity "gives government officials breathing

---

[23] Similarly, neither Miller nor Steven could face liability for violating Plaintiff's procedural due process rights, as they are members of the Department, but not members of the Board of Directors or the Board of Commissioners.  (*See* Aug. 14 Meeting Tr. 2–3 (identifying members of the Board of Commissioners and Board of Directors present, but not identifying Miller or Steven); Miller Dep. Tr. 14 (identifying Steven as a member of the Department); Miller Letter 1 (letter from Miller indicating that he is a member of the Department).)

[24] Defendants originally argued that Goodwin, Kuklevsky, Godfrey, Bergstrom, Beshears, Consentino, Jacobs, Klosowski, Clair, Schramek, and Tofte were entitled to qualified immunity.  (Defs.' Mem. 2–3.)  However, all but Jacobs, Goodwin, and Klosowski were

room to make reasonable but mistaken judgments," and it protects "all but the plainly incompetent or those who knowingly violate the law." *City & Cty. of S.F. v. Sheehan*, —U.S.—, 135 S. Ct. 1765, 1774 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S.Ct. 2074, 2085 (2011)). A government official will be protected from liability for his discretionary actions by the doctrine of qualified immunity "if either (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *See Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001) (citation and internal quotation marks omitted); *see also Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) ("The issues on qualified immunity are: (1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was 'clearly established'; and (3) even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful."); *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004) ("[A] right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." (alterations and internal quotation marks omitted)). "The matter of whether a right was clearly established at the pertinent time is a question of law." *Kerman v. City of N.Y.*, 374 F.3d 93, 108 (2d Cir. 2004). "In contrast, the matter of whether a defendant official's conduct was objectively reasonable, i.e., whether a reasonable official would reasonably believe his conduct did not violate a clearly established right, is a mixed question of law and fact." *Id.* at 109 (italics omitted).

---

voluntarily dismissed. (*See* Dkt. No. 43.) Additionally, while the Court has already granted summary judgment in favor of Klosowski, for the reasons stated herein, it concludes that he would be, in any event, protected by the doctrine of qualified immunity.

Consequently, "[a]lthough a conclusion that the defendant official's conduct was objectively

reasonable as a matter of law may be appropriate where there is no dispute as to the material

historical facts, if there is such a dispute, the factual questions must be resolved by the

factfinder." *Id.* (citations omitted).

Here, there can be little question that the law was clearly established that Plaintiff, having

a property interest in his position, was entitled to process related to his expulsion. *See Taravella*

*v. Town of Wolcott*, 599 F.3d 129, 134 (2d Cir. 2010) (finding clearly established since

*Loudermill* that government employees who may be terminated only for cause must be afforded

opportunity to present their side of the story before discharge).  However, that is not to say it fell

short of being "objectively reasonable for [Jacobs, Goodwin, and Klosowski] to believe that

[their] action[] [in connection with Plaintiff's termination] [was] lawful at the time." *Cerrone*,

246 F.3d at 199 (internal quotation marks omitted).  To the contrary, here, it was reasonable for

them to believe that they were within their rights terminating Plaintiff:  Indeed, the Department's

bylaws provided that the Board of Directors could "remove a member . . . upon due notice via a

registered letter from the recording secretary," with no mention made of a required hearing.  (*See*

Bylaws Art. 12.)  Moreover, they did so against the backdrop of New York Municipal Law

§ 209-l, which provides that "[t]he provisions of this section shall not affect the right of members

of any fire company to remove a volunteer officer or voluntary member of such company for

failure to comply with the constitution and by-laws of such company."  Finally, as Defendants

point out, New York courts have held—albeit as a statutory matter—that firefighters are not

entitled to a pre-expulsion hearing when removed pursuant to a fire department's bylaws.  *See*

*Armstrong*, 638 N.E.2d at 960 (reasoning "[the] [p]etitioner was not statutorily entitled to a

hearing before being expelled for having violated respondent's bylaws" because "[§ 209-l] only

grants volunteer officers and volunteer members of fire departments the right to a hearing (upon written notice of charges) before being removed on the ground of incompetence or misconduct"); *Leahy v. Jordan*, 615 N.Y.S.2d 706, 707 (App. Div. 1994) ("General Municipal Law § 209–l . . . provides that a hearing is required only for removal of a volunteer [firefighter] on the ground of incompetence or misconduct[;] . . . no hearing is necessary for a discharge based upon absenteeism . . . ."); *cf. Pawlowski*, 784 N.Y.S.2d at 787 (App. Div. 2004) (concluding that the plaintiff was entitled to a hearing under § 209-l because the bylaws did not address the conduct at issue).[25]   Thus, it was objectively reasonable for Jacobs, Goodwin, and, to the extent he could otherwise even be held liable, Klosowski to conclude they were acting lawfully, and, hence, they are protected by the doctrine of qualified immunity.[26]   *See Taravella*, 599 F.3d at 135 (finding an individual defendant protected by the doctrine of qualified immunity where he "read the [employment] [a]greement [at issue], sought legal advice, and reasonably concluded that [the plaintiff] could be terminated without a hearing").   Similarly, Jacobs, Goodwin, and Klosowski

---

[25] It bears noting that New York state court decisions are not relevant in determining whether a right is clearly established.   *See Luna*, 356 F.3d at 490 (noting that "a right is clearly established if," inter alia, "the Supreme Court or the Second Circuit has recognized the right" (alteration and internal quotation marks omitted)).   However, these New York state court decisions are instructive, inasmuch as they support the notion that "official[s] . . . [would] objectively and reasonably believe[] that [they] [were] acting lawfully," *id.*, in expelling a firefighter under circumstances like those in this case.

[26] One could imagine a response that Plaintiff *was* found guilty of misconduct, inasmuch as "conduct unbecoming" could amount to misconduct.   However, in considering whether a firefighter is entitled to a hearing, New York case law has turned on whether the conduct was addressed in the bylaws.   *See Pawlowski*, 784 N.Y.S.2d at 786–87 (observing that the petitioners were found to have violated the fire company's fuel use policy and lying to the board of inquiry, but concluding that they were not entitled to a hearing with regard to the former, because they "were charged with violating a provision of the Fire Company's bylaws with respect to fuel use," but that they were entitled to a hearing in connection with the charge of lying to the board, because "[t]he bylaws that are in the record do not address such conduct").

did not violate clearly established law, as, as neither "the Supreme Court [n]or the Second

Circuit ha[d] recognized the right" to a hearing despite § 209-l's apparent import to the contrary.

*Luna*, 356 F.3d at 490 (internal quotation marks omitted).[27]

### 2.  First Amendment Retaliation

Defendants also move for summary judgment as to Plaintiff's claim for First Amendment

retaliation.  (*See* Defs.' Mem. 10–16.)  "In adjudicating the rights of public employees to speak

without facing retaliation from a government employer," the Second Circuit has recently

explained, "courts attempt 'to arrive at a balance between the interests of the employee, as a

citizen, in commenting upon matters of public concern and the interest of the State, as an

employer, in promoting the efficiency of the public services it performs through its employees.'"

*Lynch v. Ackley*, 811 F.3d 569, 577 (2d Cir. 2016) (alteration omitted) (quoting *Pickering v. Bd.

of Ed*, 391 U.S. 563, 568 (1968)).  In so doing, "[c]ourts must weigh the employee's speech

interests against the government's interest in 'effective and efficient fulfillment of its

responsibilities to the public, including promoting efficiency and integrity in the discharge of

official duties, and maintaining proper discipline in public service.'"  *Id.*  (alterations omitted)

(quoting *Lane v. Franks*, — U.S. —, 134 S.Ct. 2369, 2381 (2014)).

To that end, while the Second Circuit has "described the elements of a First Amendment

retaliation claim in several ways, depending on the factual context," *Williams v. Town of

Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008), it has made clear that, in the public employee

context, "[w]hether . . . speech is protected from retaliation under the First Amendment entails

two inquiries," *Ruotolo v. City of N.Y.*, 514 F.3d 184, 188 (2d Cir. 2008), specifically, "(1)

---

[27] For this reason, it is immaterial whether Goodwin, in fact, voted to expel Plaintiff.
(*Compare* Defs.' 56.1 ¶ 91 *with* Pl.'s 56.1 ¶ 91.)

'whether the employee spoke as a citizen on a matter of public concern' and, if so, (2) 'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.'"   *Id.* (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).  "This step one inquiry in turn encompasses two separate subquestions:  (1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee."  *Matthews v. City of N.Y.*, 779 F.3d 167, 172 (2d Cir. 2015) (internal quotation marks omitted).  Additionally, and relevant here, "[t]o constitute speech on a matter of public concern, an employee's expression must 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Jackler v. Byrne*, 658 F.3d 225, 236 (2d Cir. 2011) (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)); *see also Schoolcraft v. City of N.Y.*, No. 10-CV-6005, 2012 WL 2161596, at *4 (S.D.N.Y. June 14, 2012) (same), *reconsideration denied*, 2012 WL 2958176 (S.D.N.Y. July 20, 2012).  "If the answer to either question is no, that is the end of the matter."  *Matthews*, 779 F.3d at 172; *see also White v. City of N.Y.*, No. 13-CV-7156, 2014 WL 4357466, at *9 (S.D.N.Y. Sept. 3, 2014) ("If the answer to this question is no, then 'the employee has no First Amendment cause of action based on [his] employer's reaction to the speech.'" (alterations omitted) (quoting *Garcetti*, 547 U.S. at 418)).  "If, however, both questions are answered in the affirmative," the Second Circuit has explained that "the court then proceeds to the second step of the inquiry, commonly referred to as the *Pickering* analysis: whether the relevant government entity 'had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer.'"  *Matthews*, 779 F.3d at 172 (quoting *Lane*, 134 S. Ct. at 2380).

55

To begin, Defendants argue that Plaintiff's invectives directed toward the non-participating attendees at the firehouse cannot serve as predicate speech for purposes of a First Amendment retaliation claim.  Indeed, whether the non-participating members should be termed, in Plaintiff's words, "a piece of shit," a "bunch of niggers," or persons to whom one might direct "generic curse words," (Pl.'s 56.1 ¶ 27), cannot be "fairly considered as relating to any matter of political, social, or other concern to the community."  *Jackler*, 658 F.3d at 236 (internal quotation marks omitted).  Indeed, the Court is hard pressed to find that such undeniably revulsive and vulgar language could or should be part of a discourse on matters of public concern.  *See Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1187 (6th Cir. 1995) ("Focusing on the 'content, form[,] and context' of [the plaintiff's] use of the word 'nigger,' this [c]ourt can find nothing 'relating to any matter of political, social[,] or other concern to the community.'"); *Thayer v. City of Holton*, 515 F. Supp. 2d 1198, 1201–02, 1206–07 (D. Kan. 2007) (finding that a number of vulgar statements, including that the manager of the city for which the plaintiff worked was a "gutless piece of shit," were not matters of public concern).

Unsurprisingly, Plaintiff does not hinge his First Amendment retaliation claim upon the notion that he was unfairly expelled in his racist outburst; rather, he expresses skepticism that his expulsion was truly for his use of racial slurs.  (*See* Pl.'s Opp'n 14–17.)  To that end, he regurgitates a litany of assertions from his 56.1 Counter Statement indicating, inter alia, that other Department members regularly used profanity, that McMurray used the word "nigger" in regard to an African-American member while he was present, and that Giambattisto testified to hearing racial slurs used regularly.  (*See id.* at 15–17.)  Moreover, Plaintiff argues that no Department member, apart from him, has been expelled within the past ten years, and that no Department member has ever been punished for the use of racial slurs.  (*See id.* at 17.)

56

According to Plaintiff, "[t]he[se] disputed material factual issues regarding Defendants' intent preclude granting summary judgment on Plaintiff's First Amendment Retaliation Claim." (*Id.* at 17.) At best, Plaintiff has articulated his suspicions for why there may have been more to his dismissal than Defendants' stated reasons.

Even assuming that Plaintiff spoke out on members' putative failure to come to the firehouse and, more generally, an increasing unwillingness to participate in the non-firefighting activities of a volunteer fire department, (*see* Defs.' 56.1 ¶ 61; Pl's 56.1 ¶ 61), this still does not qualify as a matter of public concern. It is true that matters concerning the internal affairs of a fire department can be a matter of public concern, *see, e.g.*, *Gusler v. City of Long Beach*, 823 F. Supp. 2d 98, 126 (E.D.N.Y. 2011) ("The subject of the letter [at issue] was the alleged deficiencies in recent firefighter responses in Long Beach, including allegations of misconduct, malpractice and negligence. Such behavior within the fire department would be of general interest[,] and of value and concern to the public." (internal quotation marks omitted)); *Shanks v. Vill. of Catskill Bd. of Trustees*, 653 F. Supp. 2d 158, 165 (N.D.N.Y. 2009) (reporting fire department safety violations to government agency was a matter of public concern); *Brantley v. City of New Haven*, 364 F. Supp. 2d 198, 202 (D. Conn. 2005) (finding the plaintiff's critique of a municipal fire department's efforts to promote racial diversity was "undoubtedly . . . a matter of public concern"); however, an otherwise internal workplace issue does not become a matter of public concern simply because it occurs within a fire department, *see, e.g.*, *Fotopolous*, 11 F. Supp. 3d at 364 ("There is no reason to believe the public would be concerned about which firefighter holds what office in an internal [c]ompany or faction."); *see also Mulcahey v. Mulrenan*, 328 F. App'x 8, 9 (2d Cir. 2009) ("[T]he fact that one of the stated reasons for the [fire captain's] request [at issue] touches upon the training and preparedness of the FDNY [does

not] . . . evince[] a 'broader public purpose.'"); *cf. Benson v. Daniels*, 89 F. Supp. 2d 212, 218 (D. Conn. 2000) (concluding that "[a] reasonable jury could conclude that it was objectively reasonable for [the defendant] to have known that [the plaintiff's] speech on the television program was Constitutionally protected," where "[the plaintiff's] comments addressed the state of alleged racism within the department as a whole, and did not solely focus on a particular personal grievance he had with the department").  Here, at best, Plaintiff's tirade can be regarded as relating to the question of whether certain members of the Department were not attending ceremonial events that they should have been.  (*See* Pl.'s Dep. Tr. 160–62 (indicating that Plaintiff's conversation with McMurray is the "only conversation" that forms the basis of his claim that his free speech was violated and that he did not discuss the "boycott" of the firehouse as reflected in the July 2011 Facebook posts in his conversation with McMurray on the night in question); Aug. 14 Meeting Tr. 89 (indicating that McMurray testified that Plaintiff regarded it as "fucking bullshit" that persons who did not march were at the firehouse and drinking).)[28] Simply put, members of the public would no more care about whether, in Plaintiff's estimate, it was unfair that some members of the Department should be permitted to drink at the firehouse despite having not marched in the parade than they would "which firefighter holds what office in an internal [c]ompany or faction." *Fotopolous*, 11 F. Supp. 3d at 364 (E.D.N.Y. 2014).

---

[28] To the extent that Plaintiff would take the position that his concerns over Department members' unwillingness to take part in non-firefighting activities included such weightier issues as their willingness to attend EMS calls, (*cf.* Pl.'s 56.1 ¶ 61 (noting that Klosowski "acknowledged that members had refused to attend EMS calls so frequently that the Fire District had been forced to hire paid workers in 2013 to respond to EMS calls for the majority of each week")), Plaintiff has pointed to nothing in the record to suggest that he broached this topic on the evening in question.

### 3.  Defamation

At the outset, while Plaintiff's  Complaint alleges that "Defendants . . . made false statements of fact concerning Plaintiff to third parties, both in writing, and through spoken words," (Compl. ¶ 79), it is not completely clear upon which facts Plaintiff rests his defamation claims, (*see* Compl. ¶¶ 79–82).[29]  In opposing Defendants' Motion for Summary Judgment, however, Plaintiff's Counter 56.1 Statement breaks out certain facts under the heading "Whether Martin Miller's letter contained false statements of fact," in which he addresses (1) the content of Miller's letter and (2) the content of Steven's February 27, 2012 resignation letter.  (*See* Pl.'s Counter 56.1, at unnumbered 52–57, ¶¶ 1–42.)  Additionally, in responding to ¶ 66 of Defendants' 56.1 Statement, which indicated that Plaintiff "claims [certain Defendants] defamed him by labeling him a racist," while Plaintiff noted that certain of the mentioned Defendants were terminated from the lawsuit, he nonetheless has asserted claims against certain other Defendants, "including that [Plaintiff] was a 'racist', that harmed [Plaintiff] in his professional and personal reputation," and further asserting that "the expulsion letter sent to [Plaintiff] . . . incorporates the false and defamatory statements made by Martin Miller, with actual malice."  (Pl.'s 56.1 ¶ 66.)  The Court takes its cue from these sections as to the content of Plaintiff's defamation claim, as, in his opposition, Plaintiff does not clarify the basis for his defamation claim, and, much to the contrary, says "[a]s described in the factual section above, Plaintiff has produced ample evidence to demonstrate the existence of genuine issues of material fact, which makes Plaintiff's defamation claim inappropriate for summary judgment," and that "[p]aragraph 66 to Plaintiff's Response to Defendants' 56.1 Statement, which has more than

---

[29] Plaintiff never heard Goodwin, Jacobs, or Klosowski call him a racist.  (Defs.' 56.1 ¶ 67; Pl.'s 56.1 ¶ 67.)

forty (40) discrete subparagraphs, identifies the type of convincing evidentiary support for Plaintiff's claim that Defendants acted with actual malice."  (Pl.'s Opp'n 21.)

### a.  Applicable Law

Because Plaintiff's defamation allegations turn upon the content of these letters, his is a claim of libel.  *See Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001) (explaining that "[g]enerally, spoken defamatory words are slander; written defamatory words are libel"); *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000) ("Libel is a method of defamation expressed in writing or print.").  To recover for libel under New York law, a plaintiff must "prove five elements: (1) a written defamatory statement of fact regarding the plaintiff; (2) published to a third party by the defendant; (3) [the] defendant's fault . . . ; (4) the falsity of the defamatory statement; and (5) injury to [the] plaintiff."  *Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001); *see also Giuffre v. Maxwell*, —F. Supp. 3d—, 2016 WL 831949, at *2 (S.D.N.Y. Feb. 29, 2016) (same).  Additionally, an otherwise actionable statement may not be actionable if subject to a qualified privilege.  *See, e.g.*, *Colantonio v. Mercy Med. Ctr.*, 24 N.Y.S.3d 653, 658–59 (App. Div. 2016) ("Generally, communications 'protected by a qualified privilege are not actionable unless a plaintiff can demonstrate that the declarant made the statement with malice.'" (quoting *Rosenberg v. MetLife, Inc.*, 866 N.E.2d 439, 442 (N.Y. 2007))).  Before exploring why Defendants are entitled to summary judgment on each of the letters, the Court must first survey the legal principles underlying several of these requirements.

### i.  Fact vs. Opinion

With regard to the first of these elements, under New York law, "'pure opinion' . . . is not actionable because '[e]xpressions of opinion, as opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation.'"

*Davis v. Boeheim*, 22 N.E.3d 999, 1004 (N.Y. 2014) (quoting *Mann v. Abel*, 885 N.E.2d 884, 885–86 (N.Y. 2008)); *see also Levin v. McPhee*, 119 F.3d 189, 196 (2d Cir. 1997) ("[E]xpressions of opinion are not actionable . . . ."); *Gross v. N.Y. Times Co.*, 623 N.E.2d 1163, 1166 (N.Y. 1993) (noting that "expressions of opinion . . . are not actionable," but that "assertions of fact . . . may form the basis of a viable libel claim").  "Distinguishing between fact and opinion is a question of law for the courts, to be decided based on what the average person hearing or reading the communication would take it to mean."  *Davis*, 22 N.E.3d at 1004–05 (internal quotation marks omitted); *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 718 (S.D.N.Y. 2014) ("Whether a statement is opinion or rhetorical hyperbole as opposed to a factual representation is a question of law for the court." (alteration and internal quotation marks omitted)).  "The dispositive inquiry is whether a reasonable reader could have concluded that the statements were conveying facts about the plaintiff."  *Davis*, 22 N.E.3d at 1005 (alterations and internal quotation marks omitted); *see also Celle*, 209 F.3d at 178 ("The 'essential task is to decide whether the words complained of, considered in the context of the entire communication and of the circumstances in which they were . . . written, may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion.'" (alteration in original) (quoting *Steinhilber v. Alphonse*, 501 N.E.2d 550, 552–53 (N.Y. 1986)).  A court should not "sift[] through a communication for the purpose of isolating and identifying assertions of fact;" rather, it "should look to the over-all context in which the assertions were made and determine on that basis whether the reasonable reader would have believed that the challenged statements were conveying facts about the plaintiff."  *Davis*, 22 N.E.3d at 1005 (alterations and internal quotation marks omitted).  Accordingly, the courts have recognized that "[a] combination of individual statements which in themselves may not be defamatory might

lead the reader to draw an inference that is damaging to the plaintiff." *Herbert v. Lando*, 781

F.2d 298, 307 (2d Cir. 1986); *see also Macineirghe v. Cty. of Suffolk*, No. 13-CV-1512, 2015

WL 4459456, at *10 (E.D.N.Y. July 21, 2015) ("Defamation by implication occurs where a

combination of individual statements which in themselves may not be defamatory might lead the

reader to draw an inference that is damaging to the plaintiff." (alteration and internal quotation

marks omitted)).   In distinguishing between fact and opinion, courts apply three factors:

> (1) whether the specific language in issue has a precise meaning which is readily
> understood; (2) whether the statements are capable of being proven true or false; and
> (3) whether either the full context of the communication in which the statement
> appears or the broader social context and surrounding circumstances are such as to
> signal readers or listeners that what is being read or heard is likely to be opinion, not
> fact.

*Davis*, 22 N.E.3d at 1005 (alterations and internal quotation marks omitted); *see also Giuffre v.*

2016 WL 831949, at *3 (same).

### ii.  Fault

As a matter of federal constitutional law, the standard of fault required to sustain a libel

claim varies depending on the status of the plaintiff. *Greene v. Paramount Pictures Corp.*, — F.

Supp. 3d —, 2015 WL 5794313, at *9 (E.D.N.Y. Sept. 30, 2015).   "[U]nder the First

Amendment, a public official cannot recover for a defamatory falsehood relating to his official

conduct unless he proves that the statement was made with 'actual malice'—that is, with

knowledge that it was false or with reckless disregard of whether it was false or not," *Air Wisc.*

*Airlines Corp v. Hoeper*, 134 S. Ct. 852, 861 (2014) (some internal quotation marks omitted), a

limitation later expanded to public figures, *see Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 154–55

(1967), and equally applicable to "limited-purpose" public figures, *see Biro v. Conde Nast*, 807

F.3d 541, 544 (2d Cir. 2015).   However, as far as the United States Constitution is concerned, "a

private plaintiff in a defamation action can[] recover for a published falsehood [if] he proves that

the defendant was at least negligent in publishing the falsehood." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 763 (1985) (Burger, C.J., concurring).

Nevertheless, the New York Court of Appeals has declined the invitation to set the bar for private plaintiffs as low as negligence "where the content . . . is arguably within the sphere of legitimate public concern," in which case the plaintiff "must establish, by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." *Chapadeau v. Utica Observer-Dispatch, Inc.*, 341 N.E.2d 569, 571 (N.Y. 1975).[30]  In determining whether content is arguably within the sphere of legitimate public concern, the New York Court of Appeals has cautioned that "publications directed only to a limited, private audience are matters of purely private concern." *Huggins v. Moore*, 726 N.E.2d 456, 460 (N.Y. 1999) (internal quotation marks omitted).  "In light of the extremely broad interpretation of that standard by New York courts, decisions in which *Chapadeau* was held inapplicable because the subject matter was not a matter of legitimate public concern are extremely rare." *Albert*, 239 F.3d at 269.

### iii.  Privilege

"New York affords qualified protection to defamatory 'communication[s] made by one person to another upon a subject in which both have an interest.'" *Albert*, 239 F.3d at 272 (alteration in original) (quoting *Stillman v. Ford*, 238 N.E.2d 304, 306 (N.Y. 1968)); *see also Chao v. Mount Sinai Hosp.*, No. 10-CV-2869, 2010 WL 5222118, at *7 (S.D.N.Y. Dec. 17,

---

[30] "[W]hile *Chapadeau* itself was about the liability of a media defendant for statements contained in a published article, the standard also governs suits by private plaintiffs . . . against non-media defendants," provided that the allegedly defamatory statements "were arguably within the sphere of public concern and admit of measurement by the *Chapadeau* standard, at least when they are publicly made." *Albert*, 239 F.3d at 269 (internal quotation marks omitted).

2010) ("New York recognizes a 'common interest' qualified privilege that protects communications 'made by one person to another upon a subject in which both have an interest.'" (quoting *Liberman v. Gelstein,* 605 N.E.2d 344, 349 (N.Y. 1992))), *aff'd*, 476 F. App'x 892 (2d Cir. 2012).

"Communications by supervisors or co-workers made in connection with the evaluation of an employee's performance, including allegations of employee misconduct and communications regarding the reasons for an employee's discharge, fall within the privilege." *See Albert*, 239 F.3d at 272 (citing *McNaughton v. City of N.Y.*, 650 N.Y.S.2d 688, 689 (App. Div. 1996); *Mock v. LaGuardia Hospital-Hip Hosp., Inc.*, 498 N.Y.S.2d 446, 447 (App. Div. 1986)); *see also Ibraheem v. Wackenhut Servs., Inc.*, 29 F. Supp. 3d 196, 217 (E.D.N.Y. 2014) ("[I]nsofar as [two employees] could be held liable for passing along what was reported to them by [two other employees], they are protected by the so-called common-interest privilege that applies to defamation claims in New York."); *Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 415 (S.D.N.Y. 2009) ("[The counterclaim defendant] admits that it distributed the . . . [m]emorandum to its employees.  This distribution is protected by the common interest privilege because [the counterclaim defendant] and its employees have a common interest in [the counterclaimant's] alleged employment-related misconduct." (footnote omitted)); *Qureshi v. St. Barnabas Hosp. Ctr.*, 430 F. Supp. 2d 279, 284, 291 (S.D.N.Y. 2006) (finding statement by doctor in medical residency program to resident's father that the resident was feeling sad and needed therapy subject to qualified privilege).  Consequently, a letter from an employer to an employee explaining the reasons for his termination will fall within the scope of that qualified privilege.  *See Burns v. Palazola*, 803 N.Y.S.2d 169, 170 (App. Div. 2005) ("[T]he termination letter was protected by a qualified privilege since the defendant made the communication upon a

subject in which he had an interest to speak, and the communication was made to persons with a corresponding interest." (alterations and internal quotation marks omitted)).  Similarly, a complaint from a member of one organization to a supervisory official concerning a member's conduct will therefore also trigger the qualified privilege.  *Phelan v. Huntington Tri-Vill. Little League, Inc.*, 868 N.Y.S.2d 737, 738–39 (App. Div. 2008) (finding letter from little league umpire to director of the Department of Parks and Recreation concerning a little league coach's "unacceptable and despicable language and behavior" to be shielded by common-interest privilege (internal quotation marks omitted)).

"A defendant forfeits this qualified privilege by making a false, defamatory statement with 'malice' of either the common-law or constitutional variety."  *Albert*, 239 F.3d at 272 (citing *Liberman*, 605 N.E.2d at 349–50); *see also Peffers v. Stop & Shop Supermarket Co.*, No. 14-CV-3747, 2015 WL 5460203, at *7 (S.D.N.Y. June 9, 2015) (noting that, "[o]nce qualified privilege has been established, a plaintiff must show that [the] defendants acted with malice in order to overcome the privilege," which may be "either of the common law or of the constitutional variety" (italics and internal quotation marks omitted)); *Makinen v. City of N.Y.*, 53 F. Supp. 3d 676, 702 (S.D.N.Y. 2014) ("[S]tatements [subject to qualified privilege] are protected unless they were made with common-law malice . . . or constitutional malice . . . .").  "Common-law malice means spite or ill will, and defeats the privilege only if it is the one and only cause for the publication."  *Albert*, 239 F.3d at 272 (alterations, citation, and internal quotation marks omitted); *see also Chandok v. Klessig*, 632 F.3d 803, 815 (2d Cir. 2011) ("[A]s to common-law malice, only if a jury could reasonably conclude that spite or ill will was the one and only cause for the publication is a triable issue raised."  (alteration and internal quotation marks omitted)); *Stukuls v. State*, 366 N.E.2d 829, 835 (N.Y. 1977) (referring to the plaintiff's

burden where the common-interest privileged attached as to "prov[e] that malice was the one and only cause for the publication"); *Bernacchi v. Cty. of Suffolk*, 988 N.Y.S.2d 663, 665 (App. Div. 2014) ("[W]here a plaintiff can demonstrate that the communication made by the defendant was not made in good faith but was motivated solely by malice, the protection provided by the qualified privilege will be inapplicable."); *Phelan*, 57 868 N.Y.S.2d at 738 (indicating that common-interest privilege is inapplicable where the communication was "motivated solely by malice"); *Golden v. Stiso*, 720 N.Y.S.2d 164, 165 (App. Div. 2001) ("Once a qualified privilege is shown to exist, the burden of proof shifts to the plaintiff to establish that the communication was not made in good faith but was motivated solely by malice.").  In endeavoring to show that such malice was the sole cause of the allegedly defamatory statement, a plaintiff may not rely on "[m]ere conclusory allegations, or charges based upon surmise, conjecture, and suspicion," which "are insufficient to defeat the claim of qualified privilege." *Bernacchi*, 988 N.Y.S.2d at 665 (internal quotation marks omitted).  "[S]pite or ill will refers not to [the] defendant's general feelings about [the] plaintiff, but to the speaker's motivation for making the defamatory statements." *Liberman*, 605 N.E.2d at 350.

In contrast to common-law malice, "[c]onstitutional or 'actual' malice means publication with 'knowledge that [the statement] was false or . . . reckless disregard of whether it was false or not.'" *Albert*, 239 F.3d at 272 (second and third alterations in original) (quoting *Liberman*, 650 N.E.2d at 349).  "Reckless disregard as to falsity means that the statement is made with a high degree of awareness of the publication's probable falsity or while the defendant in fact entertained serious doubts as to the truth of the publication." *Id.*  (alterations and internal quotation marks omitted); *see also Liberman*, 605 N.E.2d at 350 (noting that "there is a critical difference between not knowing whether something is true and being highly aware that it is

probably false," as "[o]nly the latter establishes reckless disregard in a defamation action"). Mere falsity, however, is not enough to establish malice. *See Air Wisc. Airlines Corp.*, 134 S. Ct. at 861 ("[W]e have required more than mere falsity to establish actual malice . . . ."); *Smith v. Montefiore Med. Ctr.*, 984 N.Y.S.2d 50, 51 (App. Div. 2014) ("While an allegation of falsity is insufficient to create an inference of malice, malice may be inferred from a statement that is so extravagant in its denunciations or so vituperative in its character as to warrant an inference of malice." (citation and internal quotation marks omitted)). As between constitutional malice and common law malice, the Second Circuit has noted that "[t]he critical difference between common-law malice and constitutional . . . malice is that the former focuses on the defendant's attitude toward the plaintiff, the latter on the defendant's attitude toward the truth." *Chandok*, 632 F.3d at 815 (ellipses and internal quotation marks omitted).

With these general principles in mind, the Court considers whether a reasonable jury could conclude that Plaintiff has been defamed.

### b. Steven Miller's Resignation Letter

As noted, the first of the three possible communications that could form the basis of a defamation claim is Steven Miller's resignation letter. That letter in its entirety reads:

> Chief O'Hara,
>
> With careful review and objective assessment of both operational and administrative decisions made by the office of the chief throughout the current and previous calendar year, I have decided that I can no longer accept the liability of remaining a fire officer under the current administration. Furthermore I urge you as the Chief of this department to reevaluate the leadership styles used and operational decisions made by your subordinate Chief Officers in an effort to decrease the liability to the fire district and improve overall fire ground safety. On this date February 27, 2012 I, Steven Miller, #11-643 resign from the rank of Rescue Company Captain immediately. Please note the following submissions:
>
> - Captains helmet
> - Envelope containing Captains uniform brass

       - Envelope containing various keys once issued
       - Request "fobble" access to be denied to the kitchen, training closet,
computer room, and equipment cage

     Respectfully submitted,
      Steven Miller

(*See* Massucci Decl. Ex. U.)  To the extent that a "reasonable reader" would even have "believed

that the challenged statements were conveying facts about the plaintiff," when "look[ing] to the

over-all context in which the assertions were made," *Davis*, 22 N.E.3d at 1005 (alteration and

internal quotation marks omitted), this letter cannot support Plaintiff's defamation claim because

it is time-barred:  In New York, the statute of limitations for defamation is one year.  N.Y.

C.P.L.R. 215.  Nevertheless, Plaintiff filed his Complaint on January 2, 2014, (*see generally*

Compl.), nearly two years after Steven Miller's letter, (*see* Massucci Decl. Ex. U (reflecting

February 27, 2012 date for the letter)).  Because, "[u]nder CPLR § 215(3), a claim for libel must

be asserted within one year of the date on which the libelous material first was published, that is,

displayed to a third party," *Tucker v. Wyckoff Heights Med. Ctr.*, 52 F. Supp. 3d 583, 596–97

(S.D.N.Y. 2014) (quoting *Hanly v. Powell Goldstein, L.L.P.*, 290 F. App'x 435, 439 (2d Cir.

2008)), and because "a later discovery of published defamatory material does not toll the one-

year statute of limitations," *id.* (citing *Teneriello v. Travelers Cos.*, 641 N.Y.S.2d 482, 483 (App.

Div. 1996)), Plaintiff's claim is time barred to the extent it is based upon Steven Miller's letter.

### c.  Miller's Letter

     Matters are somewhat more complicated with respect to Miller's letter.  Ultimately, a

claim based on it is also unavailing, as certain of Miller's statements are nonactionable

statements of opinion, and the others are protected by the common interest qualified privilege.

     As a preliminary matter, it is helpful to begin with a review of the content of Miller's

letter.  For analytical purposes, the allegations in Miller's letter can be conceptualized as falling

into five groups: statements concerning (1) Plaintiff's alleged past suspensions,[31] (2) others' need

to restrain Plaintiff during his purported tirade,[32] (3) Plaintiff's alleged efforts to discredit the

Miller family,[33] (4) statements and threats Plaintiff purportedly made on the night in question,[34]

and (5) allusions to Plaintiff being a racist and concern that Plaintiff may be a future threat. [35]

---

[31] Specifically, Miller says, "[Plaintiff] is a repeat Offender—This is not his first suspension for conduct unbecoming.  This is at least his third.  There was one for a fist fight with another member of the Department (Dave O'Hara)[.]  There was one when he quit as Captain of Engine Company Three.  And now his third for Racist hate speech and threats against the [welfare] of other members."  (Miller Letter, at unnumbered 3.)

[32] "Witnesses to this event, [Hill], [Clair], [McMurray], [Silverblade], among others[,] attempted to stop [Plaintiff] from pursuing these members, but he refused.  In a rage, he broke free from their guidance and continued his verbal onslaught and threats to eliminate the members once he becomes Chief of the Department further threatening anyone who stands in his way." (Miller Letter, at unnumbered 1.)

[33] Those statements include:
- "Over the last two years, there has been overt action by [Plaintiff] to discredit members of my family for what has been shown to be a personal issue.  Until recently, I did not know the root of his hatred, but now it is quite evident that he intends to use his elected Office to pursue his path of revenge."  (Miller Letter, at unnumbered 1.)
- "[D]oes it [i.e., Plaintiff's purported comment about eliminating certain persons and telling McMurray not to stand in his way] mean that once again, he is going to use the Office of the Chief in an attempt to settle a personal score?"  (Miller Letter, at unnumbered 2.)

[34] These quotes include
- "[Plaintiff] . . . began a verbal onslaught against two members of this Department he had seen walking in the parking lot outside the building.  Hurling Racial Slurs, making threats against their safety[,] and[] threats against the families of those members."  (Miller Letter, at unnumbered 1.)
- "Ratajack[']s Quote, 'When I'm Chief, I'm going to eliminate them!' 'Don't you dare stand in my way'—Stated to [McMurray]."  (Miller Letter, at unnumbered 2.)
- "Ratajack[']s Quote, 'We are nothing but worthless niggers!'"  (Miller Letter, at unnumbered 2.)
- "[Plaintiff] has, through his actions made the [Department] a 'Hostile Work Environment' as defined by the Federal Government.  A hostile work environment exists when an employee experiences workplace harassment and fears going to work because of the offensive, intimidating, or oppressive atmosphere generated by the harasser."  (Miller letter, at 3.)

[35] These statements include:

- "[N]ever have I had to deal with the outright hatred and racial bias of a member of my own Department and especially, a Chief officer." (Miller Letter, at unnumbered 1.)
- "Because of [Plaintiff's] actions, his obvious racial bias, threats against my and my famil[y'] safety as well as other members of the Department and his stated plan to use the Office of the Chief of the Department to pursue his goal, short of seeking a restraining order, I am left with no alternative but to bring formal charges against this member . . . ." (Miller Letter, at unnumbered 2.)
- "I strongly believe that his words, racial slurs and threats against my safety as well as other members of the Department are absolute grounds for removal from a position of authority and perhaps even expulsion from this Department." (Miller Letter, at unnumbered 2.)
- Regarding Plaintiff's statement that he was going to "eliminate them" and telling McMurray not to stand in his way, "Does that mean if there is a fire and he is the Incident Commander he is going to deliberately place me or my sons or certain other members of this Department in a perilous circumstance?" (Miller Letter, at unnumbered 2)
- Regarding Plaintiff's purported quote alluding to "worthless niggers," "Clearly this is racial hate speech. There is absolutely no room in the BFD for someone with such a prejudicial mindset especially a Chief Officer. Does this mean that our African[-]American members . . . are nothing but worthless niggers in the eyes of the Chief? Will anything they do, any job they perform be acceptable? And what of their safety? Will those members be placed in harm[']s way because they are minorities? What happens when we respond to a structure fire where people of color reside with [Plaintiff] as Incident Commander? Do we not attempt a rescue? Do we not make an aggressive attack because [Plaintiff] views them as worthless minorities? Do we not provide the same level of care or professionalism because they are minorities? Similarly, what happens when we respond to an MVA or accident scene where a minority is injured with [Plaintiff]? Do we not call for a medic? Or a helicopter? Do we not provide care consistent with Caucasian people?" (Miller Letter, at unnumbered 2–3.)
- "A prejudiced mind is an unfortunate circumstance. Members are free to form their own opinions[;] however, [Plaintiff] is not just a member of this Department[;] he is a Chief Officer. He is the public face of the [District]. What would the press have to say about his statements concerning worthless niggers? What would the NAACP, the ACLU, the Federal Equal Opportunity Office say?" (Miller Letter, at unnumbered 3.)
- "If brought to the attention of the Federal EEO, there are grounds for prosecution. [Plaintiff] directly controls the possibility for any of the referenced members to advance their careers. He controls who is promoted to the Officer Ranks. [Plaintiff] directly controls the possibility for any of the referenced members for advanced training. He approves who is allowed to seek advanced training or attendance at seminars. As a result of [Plaintiff]s obvious expression of his racial bias, continued participation of the affected members may be adversely affective [sic]. He can absolutely impede the career path of a member. This mindset goes beyond intent to do harm to members of this Department. It is quite apparent that there may be intent to do harm to any minority resident of this District. There is no room for someone with such a bigoted mindset in this Department. We are the BFD not the KKK. I would very much appreciate being

i.  Statements of Opinion

To begin, Miller's final category of statements—that is, his articulated concerns that Plaintiff was a racist or a future threat to others—is nonactionable opinion.  This is so for at least two reasons.  First, Miller's letter, in hypothesizing that Plaintiff is a racist and a threat to the Department, takes pains to detail the facts underlying his accusations.  For instance, before posing such questions as whether, for instance, Plaintiff would put minority members in harm's way, Miller expressly says, "[m]y request is based upon the following" and identifies the quote that gives rise to his suspicions.  (*See* Miller Letter, at unnumbered 2.)  This is significant because, as the Second Circuit has recognized, while "[a] statement[] [that] may be characterized as hypothesis . . . may . . . be actionable if [it] impl[ies] that the speaker's opinion is based on the speaker's knowledge of facts that are not disclosed to the reader," a statement of opinion is not actionable where it "discloses the facts on which it is based."  *Levin*, 119 F.3d at 197; *see also Ony, Inc. v. Cornerstone Therapeutics, Inc.*, No. 11-CV-1027, 2012 WL 1835671, at *10 (W.D.N.Y. May 18, 2012) (same), *aff'd*, 720 F.3d 490 (2d Cir. 2013).  Such is precisely the case here, and, therefore, Miller's claims that Plaintiff is a racist and may be a future harm are nonactionable opinion.  *See Silverman v. Daily News, L.P.*, 11 N.Y.S.3d 674, 675–76 (App. Div.) (finding newspaper article questioning whether a principal who had allegedly authored "racist writings" and had ties to a "white supremacist group" should be in charge of a school with a large minority population was not actionable as libel, in part because "there was full disclosure of the facts supporting the opinions"), *appeal dismissed* 38 N.E.3d 825 (N.Y. 2015), *leave to appeal denied*, 44 N.E.3d 939 (N.Y. 2015); *Russell v. Davies*, 948 N.Y.S.2d 394, 395–96 (App.

---

placed on the agenda of the next Commissioners meeting to discuss this matter further." (Miller Letter, at unnumbered 3–4.)

Div. 2012) (concluding that an article detailing the plaintiff's allegedly racist and anti-Semitic essay provided only non-actionable opinion, where "there was full disclosure of the facts supporting the opinions").

However, Miller's letter, to the extent that it asserts that Plaintiff is a racist who poses a threat of future harm, is also rightly regarded as non-actionable because its tone makes clear that its content is opinion in this respect. Courts are not to lose sight of the broader context in which contested statements are made. *See, e.g.*, *Davis*, 22 N.E.3d at 1005 (indicating that courts should consider "whether either the full context of the communication in which the statement appears . . . and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact" (alteration and internal quotation marks omitted)). Here, the context makes clear that Miller is not asserting new facts against Plaintiff, but is expounding upon the corollaries of the purported facts that he has presented—and in the form of questions no less. Simply put, tone matters. *See Sandals Resorts Int'l Ltd. v. Google, Inc.*, 925 N.Y.S.2d 407, 415 (App. Div. 2011) (finding an email to be non-actionable opinion where it was "replete with rhetorical questions" and, considered as a whole, an "exercise in rhetoric"); *cf. Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*, —F. Supp. 3d—, 2015 WL 8941120, at *5 (E.D.N.Y. Dec. 16, 2015) (noting that "rhetorical indicators" such as word choice inform the inquiry into whether a statement is opinion, and collecting cases). In this respect, it is instructive that Miller's suggestion that Plaintiff may be a racist who would pose a threat of future harm to others follows a discussion of the conduct Miller alleges Plaintiff to have engaged in, and takes the form of a series of questions. (*See* Miller Letter, at unnumbered 2–3.) Thus, a reasonable reader would not take such assertions to be statements of fact, but would rather understand them to be an exercise in fleshing out the implications of the facts previously

72

disclosed.  They are, therefore, not actionable libel.  *See Davis*, 22 N.E.3d at 1004

("[E]xpressions of opinion . . . , no matter how offensive, cannot be the subject of an action for

defamation." (internal quotation marks omitted)).

### ii.  Qualified Privilege

Miller's remaining statements are protected under the qualified privilege.  As noted,

"New York affords qualified protection to defamatory 'communication[s] made by one person to

another upon a subject in which both have an interest,'" which includes "[c]ommunications

by . . . co-workers made in connection with . . . allegations of employee misconduct."  *Albert*,

239 F.3d at 272 (first alteration in original) (quoting *Stillman*, 238 N.E.2d at 306).  Therefore,

because Miller's letter is exactly such a communication, the qualified privilege attaches.  *See*

*Campanella v. Cty. of Monroe*, 853 F. Supp. 2d 364, 369, 372 (W.D.N.Y. 2012) (finding a

common interest "clearly shared" in a "memorandum of record" prepared by a lieutenant

alleging that the plaintiff deputy sheriff violated the sheriff's office rules proscribing, among

other things, "conduct unbecoming").  The question then becomes whether Plaintiff can

demonstrate that Miller was motivated by constitutional malice or common law malice.

At the outset, it bears noting that, in his opposition to Defendants' Motion, Plaintiff

makes only a feeble attempt to assert the existence of malice, noting that "Paragraph 66 to

Plaintiff's Response to Defendants' 56.1 Statement, which has more than forty (40) discrete

subparagraphs, identifies the type of convincing evidentiary support for Plaintiff's claim that

Defendants acted with actual malice," and, more generally, asserting that malice, as a general

matter, may be difficult to determine on a motion for summary judgment.  (*See* Pl.'s Opp'n 19–

21.)  Nevertheless, Plaintiff does present some evidence to suggest that certain of Miller's

assertions were false.  Therefore, the Court will consider each remaining category of statement in

Miller's letter, in an effort to determine whether that evidence can overcome the qualified privilege.

First, Plaintiff has presented some evidence suggesting that he was not, in fact, previously suspended for conduct unbecoming. (*See* Pl.'s 56.1 ¶¶ 66(b)–(d) (citing Klosowski Dep. Tr. 19; Goodwin Dep. Tr. 41–42, 78, 84; McMurray Dep. Tr. 109); Pl.'s Counter 56.1, at unnumbered 52–53 ¶¶ 3, 5–6 (citing Klosowski Dep. Tr. 19; Goodwin Dep. Tr. 41–42, 78, 84; McMurray Dep. Tr. 109).) To that end, Plaintiff cites Klosowski's deposition transcript, which indicates that Plaintiff's disciplinary file reveals that he was not disciplined prior to that time, (*see* Klosowski Dep. Tr. 19), Goodwin's testimony, which indicates that Goodwin did not remember Plaintiff being disciplined prior to June 2013, (*see* Goodwin Dep. Tr. 42–43), and could not find evidence of Plaintiff having been suspended twice before for conduct unbecoming, (*id.* at 78–79, 85), and McMurray saying that, while he "heard of a possible incident," involving Plaintiff having been suspended earlier, he "[did not] know for a fact," (*see* McMurray Dep. Tr. 109). In contrast, in his deposition, Miller reiterates that Plaintiff was suspended for a fistfight, information that he says he learned when "letters [were] posted in the firehouse saying that [Plaintiff] was suspended." (*See* Miller Dep. Tr. 50–51.) Crediting Plaintiff's evidence, he may well have established that the Parties dispute whether Plaintiff was previously suspended; however, "neither falsity nor the existence of prior earlier disputes between the parties permit an inference of malice" for purposes of a qualified interest. *Sborgi v. Green*, 722 N.Y.S.2d 14, 15 (App. Div. 2001).

With regard to constitutional malice, a reasonable jury would not be able to conclude that Miller made the statement concerning Plaintiff's prior suspension "with knowledge that [it] was false or [with] reckless disregard of whether it was false or not," that is, "with a high degree of

awareness of the [statement's] probable falsity or while [Miller] in fact entertained serious doubts as to the truth of the publication," *Albert*, 239 F.3d at 272 (internal quotation marks omitted).  To the contrary, Miller in his deposition did not retreat from his assertion that Plaintiff had been suspended for a fistfight with O'Hara, but further claimed that he had seen a letter indicating that Plaintiff was suspended at that time for conduct unbecoming.  (*See* Miller Dep. Tr. 50–51.)  Any conclusion that Miller must have known that his assertion was false on the grounds that it was (arguably) untrue, would be an exercise in conjecture, which is insufficient to establish constitutional malice.  *See, e.g.*, *Ashby v. ALM Media, LLC*, 973 N.Y.S.2d 109, 110 (App. Div. 2013) (dismissing claim where "[the] [p]laintiff's allegations of malice, in an effort to overcome the common-interest privilege, amount to little more than mere surmise and conjecture" (internal quotation marks omitted)).

An arguably closer call exists with respect to common-law malice; however, Plaintiff's claim there, too, fails.  It is true that "[common-law malice] focuses on the defendant's attitude toward the plaintiff," *Chandok*, 632 F.3d at 815, and it is true that Miller's letter alludes to an effort on Plaintiff's part to "discredit members of [Miller's] family for what has been shown to be a personal issue," (Miller Letter, at unnumbered 1), which, one might infer, suggests a negative attitude toward Plaintiff on Miller's part.  However, for purposes of the common-interest privilege, "earlier disputes are not evidence of malice."  *Williams v. Cty. of Genesee*, 762 N.Y.S.2d 724, 727 (App. Div. 2003) (alterations and internal quotation marks omitted); *see also Sborgi*, 722 N.Y.S.2d at 15 (same); *Anas v. Brown*, 702 N.Y.S.2d 732, 734 (App. Div. 2000) (same); *McGovern v. Hayes*, 524 N.Y.S.2d 558, 560 (App. Div. 1988) (same); *Friedman v. Ergin*, 487 N.Y.S.2d 109, 111 (App. Div.) (same), *aff'd*, 485 N.E.2d 1029 (N.Y. 1985).  Even if Miller could be said to possess sufficient "spite or ill will" toward Plaintiff to permit the

conclusion that he acted with common-law malice, such malice, as noted, "defeats the privilege only if it is the one and only cause for the publication," *Albert*, 239 F.3d at 272 (internal quotation marks omitted).  Plaintiff has pointed to no evidence—nor likely could he—to suggest that spite or ill will toward Plaintiff was the *one and only* cause for Miller's decision to tell Giambattisto that Plaintiff had previously been suspended for conduct unbecoming, as opposed to, for instance, an effort to contextualize Miller's other statements in the letter.  Therefore, Plaintiff's assertion that Miller libeled him in claiming that Plaintiff had been previously suspended for conduct unbecoming is not actionable.

Similarly, Plaintiff has not established that Miller acted with the requisite malice when Miller said that "[Hill], [Clair], [McMurray], [Silverblade], among others[] attempted to stop [Plaintiff] from pursuing these members, but he refused," and that, "[i]n a rage, he broke free from their guidance and continued his verbal onslaught and threats to eliminate the members once he becomes Chief of the Department further threatening anyone stands in his way."  (Miller Letter, at unnumbered 1.)  To this end, Plaintiff has adduced evidence to suggest that Hill, (*see* Pl.'s 56.1 ¶¶ 66(e)–(f) (citing Jacobs Dep. Tr. 162; Hill Dep. Tr. 46–47); Pl.'s Counter 56.1, at unnumbered 53 ¶¶ 7–8 (citing Jacobs Dep. Tr. 162; Hill Dep. Tr. 46–47)), Clair, (*see* Pl.'s 56.1 ¶¶ 66(g)–(h) (citing Jacobs Dep. Tr. 166); Pl.'s Counter 56.1, at unnumbered 53 ¶¶ 9–10 (citing Jacobs Dep. Tr. 166)), and McMurray, (*see* Pl.'s 56.1 ¶ 66(i) (citing McMurray Dep. Tr. 102); Pl.'s Counter 56.1, at unnumbered 53 ¶ 11 (citing McMurray Dep. Tr. 102)), may not have needed to restrain Plaintiff, inasmuch as Jacobs testified that he did not think Miller's statement about Clair was true, that Clair did not testify that he attempted to stop Plaintiff from pursuing these members, and that Silverblade neither testified nor provided a written statement, (*see* Jacobs Dep. Tr. 162–63); that Hill disagreed with this statement in Miller's letter, (*see* Hill Dep.

Tr. 47–48); and that McMurray did not have to "physically" restrain Plaintiff from assaulting anyone, (*see* McMurray Dep. Tr. 102). At best, this evidence suggests that these members did not, in fact, need to restrain Plaintiff. As noted above, falseness is by itself insufficient to establish either variety of malice sufficient to overcome the common-interest privilege, *see, e.g.*, *Sborgi*, 722 N.Y.S.2d at 15 (noting that "neither falsity nor the existence of prior earlier disputes between the parties permit an inference of malice" for purposes of a qualified privilege), and, with respect to common-law malice, any assertion that spite or ill will was the *sole* cause, *see, e.g.*, *Chandok*, 632 F.3d at 815 ("[C]ommon-law malice will defeat such a privilege only if it was the one and only cause for the publication" (internal quotation marks omitted)), finds no support in the evidentiary record. Therefore, Miller's assertion concerning certain members' need to restrain Plaintiff cannot support a libel claim.[36]

Similarly, Plaintiff has not adduced sufficient evidence upon which a reasonable jury could conclude that Miller acted with malice in alleging that Plaintiff attempted to discredit him and his family. (*See* Miller Letter, at unnumbered 1.) In contesting this assertion, Plaintiff points only to evidence that McMurray knows of no efforts on Plaintiff's part to discredit the Miller family. (*See* Pl.'s 56.1 ¶¶ 66(j)–(k) (citing McMurray Dep. Tr. 99; Miller Letter); Pl.'s Counter 56.1, at unnumbered 53–54 ¶¶ 12–13 (citing McMurray Dep. Tr. 99; Miller Letter).) Far from establishing "a high degree of awareness [on Miller's part] of the [statement's]

---

[36] It bears noting that whether Plaintiff has adduced sufficient evidence to conclude this statement is false is, at a minimum, debatable. Plaintiff relies in part on McMurray's testimony that he did not have to physically restrain Plaintiff, (*see* Pl.'s 56.1 ¶ 66(i) (citing McMurray Dep. Tr. 102)); however, the language of Miller's letter does not compel the conclusion that he intended to say Hill, Clair, McMurray, Silverblade, and the others attempted to *physically* restrain Plaintiff, and, indeed, Miller's deposition transcript indicates that he did not intend such a meaning, (*see* Miller Dep. Tr. 67 ("It's not pursuing the members, maybe in a physical sense. But in pursuing his tirade.")).

probable falsity" or that Miller "in fact entertained serious doubts as to the truth of the publication," *Albert*, 239 F.3d at 272 (alterations and internal quotation marks omitted), or that common-law malice was Miller's "one and only cause for the publication" of this statement, *id.* (internal quotation marks omitted), the cited evidence, at very best, provides some basis to wonder whether Miller was right, (*see* McMurray Dep. Tr. 99 ("Q. . . . Prior to July 11, 2013, were you aware of any action by [Plaintiff] to discredit the Millers?  A.  Sorry. I'm thinking. I don't believe so, no. Other than what would be rumor.")).  This is not enough, and Plaintiff's libel claim predicated on this statement necessarily fails.

Finally, a reasonable jury could not find the privilege defeated with respect to Miller's claims that Plaintiff made threats against his family on the night in question.  Plaintiff again cites McMurray's transcript to suggest that McMurray does not know the basis of Miller's concern for his sons' safety, and never heard Plaintiff threaten the Miller family (*see* Pl.'s 56.1 ¶¶ 66(l)–(s) (citing Jacobs Dep. Tr 170; McMurray Dep. Tr. 92–93, 105–06; Miller Letter); Pl.'s Counter 56.1, at unnumbered 54 ¶¶ 14–20 (citing Jacobs Dep. Tr. 170, McMurray Dep. Tr. 92, 105–06, Miller Letter)).  However, McMurray's transcript suggests that Plaintiff indeed threatened the Millers:

Q. Have you at any time heard [Plaintiff] threaten the Miller family?

A. Yes. That day.

Q. Let's be clear. Have you ever heard him threaten the Miller family physically?

A. No. He threatened me physically that day.  Not them specifically.

Q. Okay.

A. He threatened to throw them out of the fire department at any cost.

(McMurray Dep. Tr. 92.).  Similarly, Jacobs testified that he "[did not] have any independent knowledge" of whether Plaintiff threatened Miller's safety, but that, while he would "have to go through the transcript," he "believe[d] somebody had something to say about that."  (Jacobs Dep. Tr. 169–70.)  Therefore, Plaintiff has not successfully shown malice—constitutional or common-law—sufficient to defeat Miller's qualified privilege.[37]

Because, for the reasons discussed *supra*, the remaining claims in Miller's letter are opinion, summary judgment is at this stage appropriate in favor of Defendants with respect to Miller's letter.[38]

### iii.  Fault

However, even if the common-interest privilege did not attach to any statements of fact in Miller's letter, summary judgment is nevertheless appropriate in light of New York's elevated fault standard for libel actions.  As noted, "where the content . . . is arguably within the sphere of legitimate public concern," a plaintiff "must establish, by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." *Chapadeau*, 341 N.E.2d at 571.  "To make the determination of whether content is arguably

---

[37] To be sure, as noted, Plaintiff cites evidence in support of the proposition that other members of the Department did not think him a threat to minority members.  (*See* Pl.'s 56.1 ¶¶ 66(s), (u)—(gg); Pl.'s Counter 56.1, at unnumbered 55–57 ¶¶ 21, 23–35.)  However, even if construed to bear upon the threats that Plaintiff allegedly made on the night in question, rather than the more general issue of whether he was a racist, such evidence might inform whether Plaintiff intended to follow through on his threats, but not whether he made them.

[38] Additionally, no argument could be made that Plaintiff can base a defamation claim upon this letter with respect to other Defendants, because, as Plaintiff conceded at his deposition, he was not aware of the letter being sent to anyone else, (*see* Pl.'s Dep. Tr. 188–89), and because, in order to recover for libel under New York law, a plaintiff, among other things, must establish that the statement was "published to a third party by the defendant," *Meloff*, 240 F.3d at 145.

within the sphere of legitimate public concern, allegedly defamatory statements can only be viewed in the context of the writing as a whole, and not as disembodied words, phrases or sentences." *Huggins*, 726 N.E.2d at 460 (internal quotation marks omitted).  Here, there can be little question that the content was arguably in the sphere of legitimate public concern; indeed, Defendants attach a newspaper article concerning Plaintiff's filing of the instant lawsuit.  (*See* Massucci Decl. Ex. T.)  *See also Hammerhead Enters., Inc. v. Brezenoff*, 551 F. Supp. 1360, 1362 n.1, 1369 n.7 (S.D.N.Y. 1982) (finding letter accusing the plaintiff of an "ugly and damaging slam" of welfare recipients to fall within *Chapadeau*), *aff'd*, 707 F.2d 33 (2d Cir. 1983); *Sheridan v. Carter*, 851 N.Y.S.2d 248, 250–51 (App. Div. 2008) (finding flyers containing allegations similar to those made to the press, which had included the claim that the plaintiff, among other things, yelled racial epithets at the defendant employee, "addressed a matter of public concern" (citing *Chapadeau*, 341 N.E.2d at 571)); *cf. Chapadeau*, 341 N.E.2d at 571 (finding it "abundantly clear" that an article concerning the arrest of a public-school teacher for heroin usage "falls within the sphere of legitimate public concern," in light of the plaintiff's profession, coupled with the "oft-cited menace" of heroin addiction).

That is significant, because, while Plaintiff contradicts the claims alleged in the letter, he has not adduced evidence sufficient to conclude that Miller "acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." *Chapadeau*, 341 N.E.2d at 571.  With respect to Miller's non-opinion statements, other than those about Plaintiff's prior suspensions and efforts to discredit the Miller family, the evidence makes clear that Miller spoke with a number of persons who were present for the events of July 11, 2013, (*see* Miller Dep. Tr. 9 ("On the following morning, I was contacted by several members of the department.  Each telling me

80

that—of the incident that occurred the night before . . . . I don't recall all of the names right now.
There were at least six members.  They were the members that were present during that
incident.")), and that, among other things, they told him that Plaintiff made threats against the
Miller family, (*see id.* at 10 ("Just about anyone that was at that incident approached me to tell
me that I need to watch out for myself and that there were threats made against me.")).  This
basis was sufficient for Miller to describe these events in his letter.  *Cf. Gaeta v. N.Y. News, Inc.*,
465 N.E.2d 802, 806 (N.Y. 1984) (finding the defendant did not "act[] in a grossly irresponsible
manner" under *Chapadeau* when publishing ultimately incorrect facts from a source who had
previously furnished accurate information to someone else, whose statements had inherent
plausibility, and as to whom there was no reason to suspect any animus toward the plaintiff);
*Park v. Capital Cities Commc'ns, Inc.*, 585 N.Y.S.2d 902, 906 (App. Div. 1992) (finding nothing
grossly irresponsible in statement made about plaintiff ophthalmologist accused of unnecessary
eye surgeries because, "[t]o the contrary, [the plaintiff's] actions could more accurately be
described as a carefully circumscribed effort to bring the general problem of unnecessary eye
surgery to the public's attention").  Similarly, with respect to Miller's statements that Plaintiff
had tried to discredit his family and had been suspended before, (*see* Miller Letter, at
unnumbered 1–3), Miller's testimony indicates that they were based upon his personal
knowledge, (*see* Miller Dep. Tr.  54–55 (indicating that Plaintiff attempted to discredit Miller's
family "by his actions and words and deeds" over the years); *id.* at 50–51 (indicating that he
learned of Plaintiff's prior suspension in connection with the alleged fistfight from "letters
posted in the firehouse saying that [Plaintiff] was suspended" for conduct unbecoming)).  New
York law does not task Miller with going out to find a second opinion.  *Cf. Visentin v. Haldane
Cent. Sch. Dist.*, 782 N.Y.S.2d 517, 520 (Sup. Ct. 2004) ("[S]o long as the publisher relied on at

least one authoritative source and had no good reason to doubt the veracity of that source or the accuracy of the information he or she provided, even if that information ultimately proved to be incorrect or false, the publisher has appropriately discharged its duty." (citing, inter alia, *Chapadeau*, 341 N.E.2d at 571–72)).  Therefore, Miller did not act with the requisite fault to support a defamation claim.

### d.  The Board's Termination Letter

As noted, a letter from an employer to an employee explaining the reasons for his termination will fall within the scope of the qualified privilege.  *See Burns*, 803 N.Y.S.2d at 170 ("[T]he termination letter was protected by a qualified privilege since the defendant made the communication upon a subject in which he had an interest to speak, and the communication was made to persons with a corresponding interest" (alterations, ellipses, and internal quotation marks omitted)); *see also Frechtman v. Gutterman*, 979 N.Y.S.2d 58, 64 (App. Div. 2014) (finding letter from client terminating attorney's representation of the client to be protected by common-interest qualified privilege); *Sullivan v. Am. Airlines, Inc.*, 914 N.Y.S.2d 276, 278 (App. Div. 2011) (finding that letters of termination indicating that the plaintiffs' employment was being terminated for posting racially insensitive cartoons was subject to a qualified privilege).  Accordingly, in order to turn that letter into the basis of a libel action, Plaintiff would need to offer some reason why a reasonable jury could conclude that the basis for the letter was malice, whether constitutional or common law.  *See Chandok*, 632 F.3d at 815.  Instead of doing so, Plaintiff argues that he "has produced ample evidence to demonstrate the existence of genuine issues of material fact" on the issue of malice, inasmuch as "Paragraph 66 to Plaintiff's Response to Defendants' 56.1 Statement, which has more than forty (40) discrete subparagraphs, identifies the type of convincing evidentiary support for Plaintiff's claim that Defendants acted

with actual malice." (Pl.'s Opp'n 21.) In that paragraph, before identifying various purported falsehoods in Miller's and Steven's letters, Plaintiff asserts that "Defendants' Exhibit M, the expulsion letter sent to Ratajack by the Brewster Fire Department, in cooperation with and under its concurrent authority with the Brewster Southeast Joint Fire District incorporates the false and defamatory statements made by Martin Miller, with actual malice." (Pl.'s 56.1 ¶ 66.) Regrettably, Plaintiff in no way elaborates as to his basis for claiming that the Department and the District acted with actual malice. It may be that Plaintiff believes the Board of Directors must have acted with malice in order to terminate him based on Miller's letter. However, such speculation is legally insufficient to create malice. *See, e.g.*, *Bernacchi*, 988 N.Y.S.2d at 665 ("Mere conclusory allegations, or charges based upon surmise, conjecture, and suspicion are insufficient to defeat the claim of qualified privilege." (internal quotation marks omitted)); *see also Campanella*, 853 F. Supp. 2d at 372 (finding that a memorandum of record determining that the plaintiff had engaged in "conduct unbecoming" a deputy sheriff was not the product of malice sufficient to defeat a claim of qualified privilege, where "there was clearly *some* factual basis for [the] charges and findings" (emphasis in original)).

## III.  Conclusion

For the foregoing reasons, the Court grants summary judgment to Plaintiff on his procedural due process claim as asserted against the Department and the District. In addition, the Court finds the individual Defendants are entitled to qualified immunity on the procedural due process claims. Defendants are entitled to summary judgment in all other respects. There is no need to consider whether the individual Defendants are entitled to qualified immunity with respect to the First Amendment retaliation and defamation claims, because the Court has already found them not to be liable with regard to those claims. *See Kelsey v. Cty. of Schoharie*, 567

F.3d 54, 62 (2d Cir. 2009) ("When the facts, viewed in light most favorable to the plaintiff, do not demonstrate that an officer's conduct violated a constitutional right, the court need not further pursue the qualified immunity inquiry . . . ."). Therefore, the Clerk of the Court is respectfully requested to terminate the pending motions. (*See* Dkt. Nos. 37, 50.) The Court will hold a conference on April 15, 2016, at 10:00 am.

SO ORDERED.

Dated:          March 30, 2016
                White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

84